461 S.E.2d 129

**In the Matter of BRIAN D., Jeffrey D., Sherrie D. and Allen D., Abused and Neglected Children, Infants.**

**Barbara JOHNSON, Respondent Below, Appellant,**

v.

**John NANNY, Director of Attendance, Ohio County Schools, and West Virginia Department of Health and Human Resources, Petitioners Below, Appellees.**

No. 22558.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 10, 1995.

Decided July 19, 1995.

Randy Dean Gossett, Guardian Ad Litem, Wheeling, for Jeffrey D.

Gregory A. Gellner, Artimez & Gellner, Wheeling, for Barbara J.

George P. Surmaitis, Asst. Atty. Gen., Charleston, for West Virginia Dept. of Health and Human Resources.

WORKMAN, Justice:

Appellant Barbara Johnson appeals from the May 6, 1993, order of the Circuit Court of Ohio County terminating her parental rights to her son, Jeffrey D.[1] Given the lengthy and convoluted procedural history of this case, we ordered on January 27, 1995, that an immediate home study be completed and returned to this Court by February 10, 1995. We further ordered that telephone communication between Jeffrey and Appellant be immediately restored and suggested that supervised visitation be arranged, provided that the home study did not indicate that visitation would be harmful to Jeffrey.[2] After reviewing this matter in full, we reverse the termination order and remand this case to

---

1. We identify the child at issue by initials given his juvenile status plus the sensitive factual nature of this case in accordance with this Court's previous decisions. *See, e.g., In re Jonathan P.,* 182 W.Va. 302, 303, 387 S.E.2d 537, 538 n. 1 (1989).

2. Our order re-establishing visitation was necessitated by: (1) the complete extinguishment of visitation between Jeffrey and Appellant since December 30, 1993, based solely on a petition asserting neglect on the basis of Jeffrey's truancy from kindergarten at a time when he was not legally required to attend school; (2) evidence in the record of a close emotional bond between Jeffrey and Appellant; and (3) the granting of a stay of Appellant's termination pending appeal, but denial of continued contact.

the court below to consider fashioning a meaningful improvement period and ultimately to determine whether it is in the best interests of Jeffrey to be returned to his mother's custody.

## I. Seven Years of a Child's Life

In his concurring opinion in *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991), Justice Thomas B. Miller called the majority opinion "the bible not only for our circuit courts, but for all who are involved in this sensitive and difficult field." *Id.* at 633, 408 S.E.2d at 385 (Miller, J., concurring). The protracted procedural history of this case, as well as its substantive disregard of the rights of all the parties, could make the record below the bible for how not to handle an abuse and neglect case. Furthermore, the muddled state of the record in this matter has made this case difficult to sort out. It is especially troubling that although there are strong intimations of significant neglect and possible abuse, the only allegation of neglect or abuse ever formally alleged was truancy from kindergarten. Yet this matter has now lingered in the court system for almost seven years, without any permanent resolution for Jeffrey.

On December 8, 1988, John Nanny, the director of attendance for the Ohio County schools filed a petition against the Appellant [3] pursuant to West Virginia Code §§ 49-6-1 to -11 (1992 & Supp.1994),[4] alleging neglect on the grounds that Jeffrey had missed twenty-four days of kindergarten out of a possible thirty-two days as of mid-October.[5] On December 9, 1988, a hearing was held on the neglect petition which resulted in the entry of an order directing that psychological evaluations be performed on Appellant, as well as her four children. The circuit court held a status hearing on the petition on January 27, 1989, and concluded that because Jeffrey was not emotionally ready for kindergarten, his attendance was voluntary pursuant to state law.[6] Rather than dismissing the petition as to Jeffrey, however, the court delayed its ruling pending receipt of the previously-ordered psychological evaluation.

A status hearing was held on February 17, 1989, at which time the court ordered that a court summary prepared by a protective service worker for the West Virginia Department of Human Services (hereinafter referred to as "DHS")[7] be filed and scheduled a hearing on June 2, 1989, for the purpose of reviewing the written psychological evaluations.[8] At the June 2, 1989, hearing, the court heard the testimony of John Nanny and the DHS protective service worker. The DHS worker asked the court to extend the

---

**3.** Strangely enough, no allegations were made against Jeffrey's father in the neglect petition and he was not named as a party. The record is unclear as to whether he was served with a copy of the petition.

**4.** Because neither the 1992 or the 1994 amendments to the child neglect or abuse statutes affect the substantive provisions at issue, we do not cite to prior versions of the statutes which were in effect during earlier stages of this case.

**5.** The petition also named two of Jeffrey's siblings as being truant.

**6.** The order reflecting the January 27, 1989, hearing states that: "the Court heard testimony and reviewed West Virginia Code [§] 18-8-1 and West Virginia Code [§] 18-8-1a and determined that Jeffrey D. would not be compelled to continue attending kindergarten because he does not appear emotionally ready to attend school." West Virginia Code § 18-8-1 (1994) provides that: "Compulsory school attendance shall begin with the school year in which the sixth birthday is reached prior to the first day of September of such year or upon enrolling in a publicly sup[p]orted kindergarten program...." West Virginia Code § 18-8-1a provides "[t]hat a child may be removed from such kindergarten program when the principal, teacher and parent or guardian concur that the best interest of the child would not be served by requiring further attendance...." In making its ruling, the circuit court relied on Jeffrey's lack of emotional readiness plus the fact that he had not reached the age of six prior to the first day of September 1988, given his birthdate of December 2, 1982.

**7.** Notwithstanding the renaming of the DHS to the Department of Health and Human Resources, the department will be referred to as the DHS throughout this opinion for consistency.

**8.** Although the court-ordered psychological evaluations are dated as being completed on February 2, 1989, the record reveals that the circuit court did not receive such evaluations until sometime after April 3, 1989.

improvement period [9] through November 1989 on the grounds that he had seen no indication that Jeffrey was going to start attending kindergarten in the fall.[10] He further testified that parenting classes had not been offered to Appellant as the examining psychologist had not felt that she would benefit from such classes.[11] The hearing was continued until June 30, 1989, to permit the State to call Corey Roman, the psychologist who performed the evaluations.

The prosecutor chose not to call Mr. Roman at the June 30, 1989, hearing,[12] but Mr. Nanny informed the court that Jeffrey had successfully begun attending a summer school session.[13] The court opined that the improvement period "is probably bearing fruit" and continued the matter until September 28, 1989, with the comment that "if the children's attendance is reasonable during that month then we could just dismiss this action...."

The record reflects that the next action taken in connection with this case was the court's entry of an order on August 2, 1989, terminating the "paternal parental rights of Wilbur White and of any person claiming to be the father of any or all of said children...."[14] A review of the record suggests that the impetus for terminating Mr. White's parental rights was a motion seeking to be relieved[15] by counsel originally appointed to represent the rights of the unknown father.[16]

9. The record does not contain an order reflecting the granting of an improvement period for the period covering December 1988 until the June 2, 1989, hearing. The first reference to an improvement period that appears in the record is in a court summary dated May 31, 1989, wherein a DHS worker recommends the granting of an improvement period until November 1989. In the transcript from the June 2, 1989, hearing, Judge Tsapsis indicates that she is granting the recommended improvement period through November 1989. The only stated directive, which might be viewed as a term of such improvement period, was an admonition by the court during the June 2, 1989, hearing whereby "the burden [was placed] on you [Appellant] to see to it that Jeffrey attends those classes that the arrangements have been made for." The classes referred to were part-time summer instruction at Clay Elementary for speech.

The record does not contain an order reflecting the granting of the improvement period on June 2, 1989, or setting forth the terms and conditions of such improvement period. Appellee DHS states in its brief: "The dispositional order states that the Department filed a case plan pursuant to W.Va.Code § 49–6–5. Neither the court file nor Appellee's file reflect a case plan at the time of disposition." This is highly confusing as the record tendered to this Court contains a letter dated June 30, 1989, from Gary L. Smith, Protective Service Worker, to Judge Tsapsis attaching a family case plan. That attached document provides as a goal that there are to be "[n]o unexcused days from school for children." It further requires that Appellant is to: "See to it that the children get up for school and go to school. Have doctor's excuses when children miss school. Have Jeffrey attend summer school."

10. DHS protective services worker, Gary L. Smith, testified at the hearing—"I'm very pessimistic that Jeffrey D. is going to start attending kindergarten as far as in the fall. I have seen no signs as of yet where his attitude is changing towards school."

11. The report prepared by Corey P. Roman, M.A., states that:

The examiner is not of the opinion that Ms. Johnson and her Family [sic] would gain benefit from outpatient counseling in order to deal with school attendance. The examiner suspects that limits in insight, understanding and, more importantly, motivation would circumvent successful outcome in this regard.

12. The explanation offered by the State for this tack was a determination that Mr. Roman could not offer any additional information that was not already reflected in his reports.

13. The record reflects that Jeffrey had started attending the summer program on June 13, 1989, which involved a half-day kindergarten program on some days and on others, attendance in remedial speech and reading classes.

14. The record repeatedly sets forth that Wilbur White is the biological father of Jeffrey. According to the report of psychologist William Hewitt dated March 18, 1991, Jeffrey related that he had lived with his uncle for a time. It is suggested that Jeffrey's references to his uncle were in fact to Mr. White and were apparently geared at hiding the fact that Mr. White was living periodically at the Appellant's residence. Ironically, however, the petition for abuse and neglect is silent as to the identity of the father and as to any allegations against him.

15. Counsel's motion to be relieved was prompted by an apparent change in her employment status.

16. The record provides minimal information regarding Mr. White's termination. Judge Tsapsis

The record is unclear as to whether the scheduled hearing for September 28, 1989, ever took place. Two documents in the file, however, were obviously prepared in anticipation of such a hearing. First, a court summary bearing the date of September 20, 1989, by the DHS worker was ordered filed by Judge Callie Tsapis on September 25, 1989. Interestingly, that summary contains the recommendation that "[t]he Court order that the educational neglect petition against Barbara Johnson be dismissed." Second, a letter which is dated September 28, 1989, from John Nanny to Judge Tsapis states that: "I am pleased to share with the Court the improved attendance pattern of the ... [D.] children as of this date. I would like to see an informal, unsupervised improvement period throughout the current school year."

The record suggests that this neglect case languished for almost two years before any further action was taken. The next entry in the abuse and neglect case court file pertaining to Jeffrey is a "Petition for Review of Custody," which was filed by the DHS on July 2, 1991. This petition indicates that Jeffrey had been residing at the St. John's Home for Children "continuously from March 16, 1990." The petition further re-

flects that Jeffrey "is in foster care by virtue of a Court order of the Juvenile Referee through the Circuit Court of Ohio County dated March 16, 1990." While the court record is completely devoid of any order bearing the date of March 16, 1990, counsel for Appellant obtained a copy of an order dated March 19, 1990, signed by George J. Fahey as Juvenile Referee, which directed that Jeffrey be "placed in the temporary custody of the West Virginia Department of Human Services, with said Department given the necessary authority to place the juvenile at St. John's Home for Children [17] ...." The order states no basis for Jeffrey's placement.[18]

On August 2, 1991, a hearing was held before the circuit court on the petition for review filed in connection with Jeffrey's placement for more than a year at St. John's.[19] The October 4, 1991, order reflecting this proceeding indicates that due to the necessity of appointing new counsel [20] to represent Appellant, a new hearing date was scheduled on the petition for August 9, 1991. The order further reflects that by mutual agreement of the parties the court included a directive restraining Wilbur White from be-

stated at the June 2, 1989, hearing that she was going to find the children abandoned by their father and there would therefore be "no need to have a father being represented here any longer." In response to this statement, Appellant's former counsel informed the court that "Jeffrey's father is known" and that "[h]e has shown some interest on occasion." The record contains an order entered on August 2, 1989, which states that "notice by Class II publication as required by law was made to the father or fathers of the children that their parental rights ... would be terminated...." and "that the paternal parental rights of Wilbur White ... shall be ... terminated." The record reflects additionally that a "Notice of Hearing to Appeal Termination of Parental Rights" was filed on July 19, 1989, providing Mr. White with the opportunity to appeal the termination order on September 28, 1989. Mr. White, however, has never challenged the termination of his parental rights to Jeffrey.

17. The record provides no information on the nature of this facility, but according to the 1991 West Virginia Child Care Association Directory, it appears to be a small group home for boys ages 8–14.

18. Subsequent to the oral argument of this case, this Court undertook on its own to obtain a copy of the juvenile file pertaining to Jeffrey in an effort to ascertain the nature of Jeffrey's placement at St. John's. The limited documentation which this Court obtained failed to reveal any further information regarding what incident(s) prompted the placement. The only reference in the record regarding the basis for the placement is noted in a psychological report dated March 18, 1991, and states that Jeffrey's placement was "court-ordered" "in part because of school refusal or school phobia."

19. West Virginia Code § 49–6–8(a) (1995) requires that,

"[i]f, twelve months after receipt (by the state department or its authorized agent) of physical custody of a child either by a court ordered placement or by a voluntary agreement, the state department has not placed a child in permanent foster care or an adoptive home or placed the child with a natural parent, the state department shall file with the court a petition for review of the case."

20. Apparently, Appellant's former counsel abandoned her without filing a motion with the court seeking to be relieved from his/her appointment as counsel.

ing present at the home of Appellant until further order of the court.

The August 9, 1991, hearing was an evidentiary proceeding which resulted in the entry of an order, entered on October 4, 1991, finding the children of Appellant to be abused "in that the ... [Appellant] is unable to cope with or to supervise them or control them[.]"[21] The testimony proffered at this hearing included that of Daniel Tennant, a family therapist at St. John's, who stated that Appellant required individual counseling and that he could not provide the same as his job was limited to family counseling. During the testimony of Mr. Tennant, reference was made to possible physical abuse in the nature of corporal punishment by Wilbur White.[22] This issue, however, was addressed only in passing and without any specific testimony offered to support the allegations. The only specific problem identified by protective services worker Timothy Randolph was "an inability [on Appellant's part] ... to cope with the demands of the children and an apparent need of avoiding confrontations with them[.]" The court granted a six-month improvement period[23] as to Jeffrey and a three-month improvement period concerning Appellant's three other children. Jeffrey's placement at St. John's was continued, whereas the three older children were permitted to remain in the custody of Appellant. The order also directs that Jeffrey cannot continue with overnight home visitation "until Wilbur White ... leaves the home of" Appellant. The order further continues and encourages Ap-

pellant's regular visitation of Jeffrey at St. John's.

During a status conference held on November 15, 1991, Mr. Nanny moved for the termination of Appellant's parental rights. Because the record does not include a transcript from this proceeding, it is unclear as to what specifically prompted the motion for termination of parental rights.[24] The only reference to Jeffrey in the order concerning the conference is a ruling that his placement at St. John's is to continue.

A hearing was held on January 24, 1992, for the purpose of permitting evidence to be presented with regard to Mr. Nanny's motion for termination of parental rights. As a result of this hearing, the court entered an order dated March 6, 1992, finding that any neglect by Appellant towards her children was of a passive nature and further finding that Appellant "has made progress toward improvement of her passivity."[25] The court continued Jeffrey's placement at St. John's, but ordered home visits every other weekend. The order further enjoined Mr. White "from having any contact with ... [Appellant's] children and from being present in the home of the children at any time while they are there...." The court scheduled a review proceeding for May 1, 1992, which resulted in a further continuation of Jeffrey's placement at St. John's as well as the alternating weekend home visits.

On May 18, 1992, a hearing was held during which the court entertained Appellees' motion to place Jeffrey in foster care. Jef-

---

21. There are in fact two orders that were entered on October 4, 1991: (1) the order appointing new counsel for Appellant and restraining Mr. White "from being present at the home of ... [Appellant] until further order of th[e] Court[;]" and (2) the order finding Appellant's children to be abused.

22. Mr. White declared to a family therapist at St. John's and to a DHS caseworker that " 'slapping Jeff around' " was his style of disciplining the child. This Court notes, however, that the allegation of physical abuse which surfaces periodically throughout these proceedings was never alleged in the petition and never formally addressed in any evidentiary proceeding, nor does it appear to be a specific basis for the various rulings entered throughout the years. Instead, the repeated negative references to Wilbur White

appear to be based on his negative influence and effect on Jeffrey in general, as gleaned from the court summaries and testimony of Mr. Nanny and the various DHS workers.

23. As in 1991 at the time of the court's ruling, West Virginia Code § 49–6–2(b) (1995) provides for *one* improvement period of three to twelve months.

24. In reviewing the order which reflects the *status conference* proceedings, it appears that Appellant's daughter and her welfare were more the focus of the proceeding than Jeffrey.

25. The petition was dismissed as to Jeffrey's two brothers and an improvement period of three months was ordered with regard to his sister.

frey's guardian ad litem interjected that "the counselors at St. John's believe that Jeffrey would be better off in a less restrictive environment[ ]" as the basis for such motion. After considering testimony regarding Jeffrey's progress, the court ruled that foster care arrangements should be arranged to commence on June 8, 1992. The court stated that after sixty days of foster care, it would review the situation and consider permitting him to live at home with Appellant if the foster care situation was working. The court further ordered that Appellant's home visits with Jeffrey were to continue.

At the sixty-day follow-up to Jeffrey's foster-care placement on August 6, 1992, the court directed that Jeffrey was to be returned to Appellant for a ninety-day trial visit.[26] The order directing the trial visit expressly forbade Appellant from permitting Wilbur White from having any contact with her family and directed her to contact her attorney in the event Mr. White showed up at the family's residence. The record in this case indicates that Mr. White was present in the home during several of Jeffrey's home visits prior to the ninety-day trial visit.

As a result of Jeffrey missing three of the first six days of school in September 1992, the parties returned to court on September 9, 1992. After hearing testimony from John Nanny regarding his discovery of Wilbur White in an alley behind Appellant's residence when he visited the home because of Jeffrey's absence from school, the court revoked the trial home visit and ordered that Jeffrey be returned to "whatever facility or foster home [the DHS] deemed to be best for said child."[27]

A hearing was held on November 6, 1992, and Appellant was, for the first time, permitted to testify regarding the problems she had in trying to keep Wilbur White away from her family and home.[28] By order entered January 28, 1993, the court stopped all but

supervised visitation pending proof that Wilbur White had left the area.[29] The court did order that Jeffrey be permitted to telephone Appellant "when he so desires, within reasonable limitations." The court obviously was reluctant to accept that Mr. White had indeed left the area, as the order directs the family to seek group counseling and to invite Mr. White to participate in the sessions. Because Judge Tsapis was leaving the bench at the end of 1992, the case was transferred to Judge Broadwater.

On February 16, 1993, Judge Broadwater held his first hearing in this case and endeavored to bring focus and direction to this case. He indicated that the case was ready for disposition, and the guardian ad litem again recommended termination of Appellant's parental rights. A dispositional hearing was then scheduled for March 4, 1993.

### Dispositional Hearing

The dispositional hearing began initially on March 4, 1993, and was then continued to March 24, 1993. At the first hearing, the State proffered the testimony of Dr. Maceiko, a psychologist who had seen Jeffrey approximately forty times; John Nanny; and Donna Frader, a DHS protective services worker. Dr. Maceiko testified that his recommendation was to permit Jeffrey to continue in foster care and that he not be returned to Appellant based on her pattern of passive neglect. John Nanny testified that he never intended that Appellant's rights should be terminated but that if forced to make a recommendation, he would choose termination. He further stated that he would have no problem with supervised visitation even at the post-dispositional stage. Ms. Frader agreed with Dr. Maceiko's recommendation that Jeffrey not be returned to Appellant's home. At the continuation of the dispositional hearing on March 24, 1993, Jeffrey testified that he wanted to return home and that he is attached to Appellant. Evi-

---

**26.** Only Jeffrey's guardian ad litem objected to the court's ruling that Jeffrey be permitted a trial home visit.

**27.** Jeffrey was returned to foster care effective September 9, 1992.

**28.** One specific explanation given by Appellant to the court was that the police did not help her enforce the restraining order entered against Mr. White.

**29.** The order reflects that Mr. White was purportedly residing in Cleveland, Ohio.

dence was proffered that Jeffrey called and spoke to Appellant almost every night. At the conclusion of the hearing, the court directed the parties to return on April 5, 1993.

At the proceeding held on April 5, 1993,[30] the guardian ad litem renewed his motion for termination of Appellant's parental rights while the State did not render any recommendation. Appellant asked the court for additional help, but the court indicated that it intended to terminate her parental rights as to Jeffrey.

By order entered on May 6, 1993, the court terminated Appellant's parental rights, finding that Appellant was unable to provide the continuity of care required by Jeffrey due to her lack of mental capacity and parenting skills. The court found that Appellant was unable to respond adequately or follow through with the DHS care plan by acquiring adequate parenting skills or conforming her behavior to such plan. The court further observed that there was no reasonable likelihood that the conditions of neglectful behavior could be substantially corrected and, noted additionally, the absence of a less restrictive alternative to termination. Finally, the order noted that the "[r]eunification of the child Jeffrey D. with his ... mother [wa]s not in the best interests of the child[.]" The court's termination ruling also reflects its dissatisfaction with Appellant for her failure to comply with court directives to keep Wilbur White away from her home and Jeffrey.

By order entered on December 30, 1993, the court stayed the enforcement of the termination order pending the outcome of her appeal of said order, but denied visitation rights to Appellant during the stay. Appellant filed her petition for appeal seeking a reversal of the termination order on July 13, 1994. This Court granted the petition on October 13, 1994, and placed the matter on an expedited briefing schedule. Although this matter was originally scheduled for oral argument before this Court on November 29, 1994, a motion to continue was made due to the failure of the State and the guardian ad litem to file briefs,[31] and the matter was continued to the January 1995 term of this Court.

## II. The Appeal

Appellant protests initially that the court did not have jurisdiction over Jeffrey at the time the order finding neglect was issued. She maintains that once the circuit court concluded in its order of April 5, 1989, that Jeffrey's kindergarten attendance was voluntary pursuant to state law,[32] the court no longer had jurisdiction over Jeffrey since the only ground alleged in the petition was truancy. As the State correctly explains, the circuit court properly had jurisdiction over Jeffrey following the entry of the April 5, 1989, order under the authority of West Virginia Code § 49–6–3. That statute provides, in pertinent part:

> Upon the filing of a [neglect or abuse] petition, ... [i]n a case where there is more than one child in the home, ... the petition shall so state, and notwithstanding the fact that the allegations of abuse or neglect may pertain to less than all of such children, *each child in the home for whom*

30. Although the record and the transcript itself bear the date of April 5, 1994, as opposed to 1993, this proceeding would not have occurred post-termination and the parties themselves have referred to the proceedings reflected by such transcript as having occurred on April 5, 1993. Accordingly, we presume that an error was made in transcription.

31. The motion to continue filed by the West Virginia Attorney General on behalf of the DHS reflects that there was a definite lack of communication between the office of the attorney general and the Ohio County Prosecutor's office with regard to who was responsible for representation of the DHS in connection with this case. The motion further states that the scheduling order

prepared by the clerk of this Court was not served on the Ohio County Prosecuting Attorney, the DHS, or the attorney general's office. The records of the clerk of this Court, however, reflect that two notices were sent to Randy Dean Gossett, guardian ad litem; Greg Gellner, Appellant's counsel; and Scott R. Smith, counsel for DHS regarding the original scheduling of this matter for oral argument on November 29, 1994. Additionally, it is alleged in the motion to continue that Appellant's brief, filed on November 4, 1994, was not served on the DHS or the attorney general's office. If this allegation is true, this constitutes an obvious violation of Rule 15 of this Court's Rules of Appellate Procedure.

32. *See supra* note 6.

*relief is sought shall be made a party to the proceeding.*

W.Va.Code § 49–6–3(a) (emphasis supplied).

Accordingly, Jeffrey was properly under the court's continuing jurisdiction at the time the neglect order was entered since the neglect petition at issue also named Jeffrey's siblings. By virtue of the court's continuing jurisdiction over his brothers and sister, the court had the authority to monitor the welfare of Jeffrey. *See* W.Va.Code § 49–6–3.

◼ Appellant next alleges that the circuit court failed to follow the statutory framework for terminating her rights. In syllabus point one of *State v. T.C.*, 172 W.Va. 47, 303 S.E.2d 685 (1983), this Court held that:

In a child abuse and neglect hearing, before a court can begin to make any of the dispositional alternatives under W.Va. Code, 49–6–5, it must hold a hearing under W.Va.Code 49–6–2, and determine 'whether such child is abused or neglected.' Such a finding is a prerequisite to further continuation of the case.

*Id.* at 48, 303 S.E.2d at 686. Appellant finds fault with Judge Tsapsis' finding of neglect on the sole grounds that the State was the only party which offered testimony at the hearing on August 9, 1991, at the conclusion of which the finding of neglect was made. Upon review of the record, we observe that Appellant was represented by counsel at this hearing, albeit newly appointed,[33] and that Appellant was not prevented from offering evidence during this hearing, from raising any objections to the testimony elicited at such hearing, or from seeking a continuance if more time was needed to prepare her case. Appellant further argues that she was not notified that the August 9, 1991, hearing was to be adjudicatory in nature. The record, however, does not reflect any objection raised by Appellant regarding this issue.

The next assignment Appellant raises is the failure of the State to prepare a written case plan prior to the dispositional hearing held on May 3, 1993. Pursuant to West Virginia Code § 49–6–5(a),

[f]ollowing a determination pursuant to section two [§ 49–6–2] of this article wherein the court finds a child to be abused or neglected, the department shall file with the court a copy of the child's case plan, including the permanency plan for the child. The term case plan means a written document that includes, where applicable, the requirements of the family case plan as provided for in ... [§ 49–6D–3], ... and that also includes at least the following: A description of the type of home or institution in which the child is to be placed, including a discussion of the appropriateness of the placement and how the agency which is responsible for the child plans to assure that the child receives proper care and that services are provided to the parents, child and foster parents in order to improve the conditions in the parent(s) home, facilitate return of the child to his or her own home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child.... Copies of the child's case plan shall be sent to the child's attorney and parent, guardian or custodian at least five days prior to the dispositional hearing. The court shall forthwith proceed to disposition giving both the petitioner and respondents an opportunity to be heard.

W.Va.Code § 49–6–5(a).

◼ The obligation to formulate a case plan arises upon the granting of an improvement period under West Virginia Code § 49–6–2(b). *See* Syl.Pt. 3, *State ex rel. W.Va. Dep't of Human Servs. v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987). We expounded on the time period permitted statutorily for preparing case plans and the purpose of such plans in syllabus points four and five of *Cheryl M.*:

Under W.Va.Code, 49–6D–3 (1984), the Department of Human Services is required to prepare a family case plan with participation by the parties and their counsel

---

**33.** Counsel representing Appellant had been appointed only seven days prior to the August 9, 1991, hearing.

and to submit it to the court for approval within thirty days.

The purpose of the family case plan as set out in W.Va.Code, 49–6D–3(a) (1984), is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems.

177 W.Va. at 688–89, 356 S.E.2d at 181–82, syl. pts. 4, 5.

■ More recently, we have enunciated, at length, the critical importance of developing and complying with meaningful improvement periods and family case plans in *Carlita B.* *See* 185 W.Va. at 624–29, 408 S.E.2d at 376–81. We explained in syllabus point four of *Carlita B.* that,

[i]n formulating the improvement period and family case plans, courts and social service workers should cooperate to provide a workable approach for the resolution of family problems which have prevented the child or children from receiving appropriate care from their parents. The formulation of the improvement period and family case plans should therefore be a consolidated, multi-disciplinary effort among the court system, the parents, attorneys, social service agencies, and any other helping personnel involved in assisting the family.

*Id.* at 616, 408 S.E.2d at 368. We further explained:

The goal [of improvement periods and case plans] should be the development of a program designed to assist the parent(s) in dealing with any problems which interfere with his ability to be an effective parent and to foster an improved relationship between parent and child with an eventual restoration of full parental rights a hoped-for result. The improvement period and family case plans must establish specific measures for the achievement of these goals, as an improvement period must be more than a mere passage of time. It is a period in which the D.H.S. and the court should attempt to facilitate the parent's success, but wherein the parent must un-

derstand that he bears a responsibility to demonstrate sufficient progress and improvement to justify return to him of the child.

*Id.* at 625, 408 S.E.2d at 377. In this case, the Appellees readily concede that the statutorily-required case plan was not filed prior to or at the time of the dispositional hearing.[34]

The only term imposed by the circuit court in connection with the six-month improvement period ordered at the August 9, 1991, hearing and reflected by an October 4, 1991, order was that "the children and the respondent [Appellant] shall attend family counseling and such individual counseling as is appropriate and recommended by the Department of Health and Human Resources and the staff at St. John's Home[.]" The record reflects that a family therapist at St. John's testified at the August 9, 1991, hearing that Appellant's primary problem was her nonassertiveness. Mr. Tennant testified:

Since Jeffrey has come to Saint John's last June, Barbara J., Jeffrey's mom, has been the only family member to attend family therapy. She's attended one time weekly faithfully. Unfortunately, family therapy can be done with one person but, unfortunately, not with Barbara. She lacks the ability to learn to take charge and control her family, regardless of her coming to therapy. Her family situation hasn't changed at all since I met them, because of her inability—it's no fault of hers. I think that this is just one of her problems that she has; being nonassertive. *That can be worked out in individual counseling, but my job at Saint John's is family counseling.* (emphasis supplied)

At the August 9, 1991, hearing Mr. Tennant explained his recommendation of another six-month improvement period[35] by stating, "I think that Barbara is willing to change. I think that the change can occur in six months." However, despite the recognized need for individualized counseling for Appellant, the record does not reflect that

---

34. *But see supra* note 9.

35. The DHS caseworker concurred in Mr. Tennant's recommendation regarding a six-month improvement period.

Appellant ever received this type of specialized help during this six-month improvement period. We cautioned against improvement periods being nothing but a "mere passage of time" in *Carlita B.*, yet it appears that this is exactly what occurred in the instant case. *See* 185 W.Va. at 625, 408 S.E.2d at 377.

We recognized in *Cheryl M.* that Appellant "was entitled to a meaningful improvement period to demonstrate her ability to care for her child as required by W.Va. Code, 49–6–2." 177 W.Va. at 695, 356 S.E.2d at 188. Given the failure of the State to provide Appellant with any individualized counseling aimed at addressing her lack of assertiveness, plus the absence of any additional measures taken to assist Appellant "in dealing with any problems which interfere[d] with ... [her] ability to be an effective parent[,]" the various improvement periods cannot be viewed as meaningful consistent with this Court's rulings in *Cheryl M.* and *Carlita B. See* 177 W.Va. at 695, 356 S.E.2d at 188; 185 W.Va. at 625, 408 S.E.2d at 377. Accordingly, we reverse on the grounds that Appellant was not provided the meaningful improvement period to which she was entitled.

### III. The Need for Monitoring

In *Carlita B.*, we pronounced that "[c]hild abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified pro-cedural delays wreak havoc on a child's development, stability and security." 185 W.Va. at 615, 408 S.E.2d at 367, Syl.Pt. 1, in part. As the procedural history of this case illustrates, Jeffrey's case has unnecessarily failed to reach the point of finality for many years. This case amplifies our observations in *Carlita B.* that

> [t]he bulk of the most aggravated procedural delays ... are occasioned less by the complexities of mending broken people and relationships than by the tendency of these types of cases to fall through the cracks in the system. The long procedural delays in this and most other abuse and neglect cases considered by this Court in the last decade indicate that neither the lawyers nor the courts are doing an adequate job of assuring that children—the most voiceless segment of our society—aren't left to languish in a limbo-like state during a time most crucial to their development.

*Id.* at 623, 408 S.E.2d at 375.

Despite our directive in *Carlita B.*, abuse and neglect cases still are not being accorded priority status, and many circuit courts are still doing a woefully inadequate job of monitoring and managing the progress of these cases. The instant case is one of the more aggravated examples of how courts permit these cases to flag along with no real focus or direction. *Carlita B.*, Canon 3 of the Code of Judicial Conduct,[36] and Rule 8 [37] of the Time

---

**36.** Canon 3 of the Code of Judicial Conduct requires that: "A judge shall perform the duties of judicial office impartially and diligently." Section B.(8) of that Canon provides that "[a] judge shall dispose of all judicial matters promptly, efficiently, and fairly."

**37.** Rule 8 of the Rules on Time Standards for Circuit Courts, addressing abuse and neglect proceedings, provides:

(a) *Applicability.* The time standards set forth in this rule are not intended to supersede, but to supplement, statutory provisions applicable to civil abuse and neglect proceedings.

(b) *Pre–Adjudicatory Motions.* An order shall be entered on pre-adjudicatory motions within one week of hearing on the motions.

(c) *Preliminary Hearing.* If a preliminary hearing is held, it shall be conducted within two weeks from the filing of the petition.

(d) *Adjudication.* Unless continued for good cause to a date certain or unless a pre-adjudicatory improvement period is granted, the ad-judicatory order shall be entered within one month of the filing of the petition if the child is not in temporary custody. If a pre-adjudicatory improvement period is granted, the adjudicatory order shall be entered within two weeks of the end of the pre-adjudicatory improvement period.

(e) *Disposition.* If abuse or neglect is found, the dispositional order placing the child shall be entered within six weeks of the adjudicatory order.

(f) *Post–Adjudicatory Improvement Period.* A further dispositional order shall be entered within two weeks of the end of the post-adjudicatory improvement period.

(g) *Monitoring Improvement Period.* An assessment of the status of the child(ren) and the progress of the parent(s) towards satisfying the conditions of the improvement period shall be conducted on a monthly basis.

(h) *Modification.* An order shall be entered on a motion to modify within one month of the filing of the motion.

Standards for Circuit Courts place an affirmative duty on circuit court judges to manage the progress of cases. Therefore, this Court reiterates that circuit court judges must take whatever steps are necessary to monitor abuse and neglect cases pending before them in a diligent and expeditious fashion.

We are immensely troubled by the record's suggestion that Jeffrey's removal from his home was by order of a juvenile referee rather than a circuit court, even though an abuse and neglect case was pending. West Virginia Code § 49–5–8 (1995) provides for the circuit court's entry of an order directing that a child be taken into the state's custody if one of four grounds exist.[38] Given this Court's frustrated attempt to secure the complete juvenile record pertaining to Jeffrey, however, we cannot state with certainty that a circuit court order was never entered in connection with Jeffrey's removal from his home. We can only state that the documentation that has been lodged with this Court by the circuit court clerk, and represented as "the complete record," contains no such order.

█ We simply cannot fathom why it took so many years and an order by this Court to get a permanency plan developed.[39] As late as February 10, 1993, it was noted on a progress report that "[a] long term goal has not been developed for Jeff at this time."[40] This child, as well as numerous others who are not currently before the Court, deserve

much better. They deserve to know where and with whom they are going to live and to be secure in the knowledge that there will eventually be some continuity in their fragile lives. Consistent with our recognition in syllabus point five of *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991), that "[t]he guardian ad litem's role in abuse and neglect proceedings does not actually cease until such time as the child is placed in a permanent home[,]" the obligations of the courts and the DHS similarly do not dissipate until a permanent resolution is made. *Id.* at 649, 408 S.E.2d at 401.

### IV. A Meaningful Improvement Period

Despite all the so-called "improvement periods" in this case, none of them appear to have comported with the kind of focused, goal-oriented plan that we have previously mandated. Upon remand, the court, in formulating a meaningful improvement period, should adopt the consolidated, multi-disciplinary approach we recommended in *Carlita B.*, giving regard not only to the provision of individual counseling for the mother, but also conducting a plenary review of the child's needs—physical, emotional, educational, and needed services.[41]

In this connection, however, it should be noted that the home study provided to this Court on February 19, 1995, suggests a potential obstacle to such an improvement period. Appellant repeatedly indicated that she is unwilling to participate in any counseling

(i) *Foster Care Review.* A further dispositional order shall be entered within one month of the filing of a petition for foster care review.
(j) *Reporting Standard.* The reporting standard from the filing of the petition to disposition shall be twelve months.

**38.** Those four grounds are:
(1) The petition shows that grounds exist for the arrest of an adult in identical circumstances; (2) the health, safety and welfare of the child demand such custody; (3) the child is a fugitive from a lawful custody or commitment order of a juvenile court; or (4) the child has a record of willful failure to appear at juvenile proceedings, and custody is necessary to assure his or her presence before the court. W.Va.Code § 49–5–8(a).

**39.** Only when this Court directed, by order dated January 27, 1995, that a home study was to be conducted and "[a] copy of any permanency plan

which has been prepared with regard to Jeffrey D. ... forwarded immediately to this Court[]" was such a plan first formulated.

**40.** In the home study that was submitted to this Court on February 10, 1995, it is noted that: "The previous permanent plan for Jeffrey had been for Jeffrey to remain with the Harrises [foster parents], either in subsidized adoption or permanent foster care. Jeffrey would have had input as to which type of care he desired." This reference to a "previous permanent plan" is bewildering to this Court as the parties have stated that no previous plan had ever been prepared.

**41.** The record does reflect that Jeffrey has made steady progress during his years at St. John's and in foster care.

programs offered to her by the DHS. She is quoted as stating that "she does not want an[y] involvement with the Department of Health & Human Resources, and sees our department as vindictive and harassing." The home study further indicates that Appellant "feels that she will not need any help adjusting to Jeffrey's return and has refused our offer of Family Preservation or Family Counseling Services, but states she will allow Jeffrey to continue seeing his therapist, if needed." Given this alleged unwillingness to engage in counseling services that the DHS has concluded are necessary, the circuit court on remand may inquire into this matter and if it finds that Appellant refuses to participate in individual counseling, then an improvement period would be for naught. Furthermore, a circuit court always has the authority to terminate an improvement period if there is evidence that the parent is not following the conditions prescribed or is failing to make improvement. The record is replete with indications that the Appellant has lacked insight in recognizing her parental deficits and in cooperating with the DHS to remedy the underlying problems. If a record is established on remand that the Appellant has been offered individual counseling in the past and has refused such counseling, then it may proceed to disposition.

■ At the conclusion of the improvement period, if given, the court should proceed to the determination set forth in syllabus point six of *Carlita B.*:

the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

185 W.Va. at 616, 408 S.E.2d at 368, Syl.Pt. 6, in part. In making this determination, the reality of Jeffrey's life during the last several years, including the fact that he has now resided with the Harrises for approximately three years cannot be ignored. Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren). Thus, how Jeffrey has fared educationally and emotionally with these foster parents and Jeffrey's own feelings and emotional attachments should be taken into consideration by the lower court.

As we said in *Lemley v. Barr*, 176 W.Va. 378, 343 S.E.2d 101 (1986), a case involving the rights of natural versus adoptive parents:

'The day is long past in this State, if it had ever been when the right of a parent to the custody of his or her child, where the extraordinary circumstances are present, would be enforced inexorably, contrary to the best interest of the child, on the theory solely of an absolute legal right. Instead, in the extraordinary circumstance, when there is a conflict, the best interest of the child has always been regarded as superior to the right of parental custody. Indeed, analysis of the cases reveals a shifting of emphasis rather than a remaking of substance. This shifting reflects more the modern principle that a child is a person, and not a subperson over whom the parent has an absolute possessory interest. A child has rights too, some of which are of a constitutional magnitude.'

*Id.* at 386, 343 S.E.2d at 109 (quoting *In re Bennett v. Jeffreys*, 40 N.Y.2d 543, 387 N.Y.S.2d 821, 356 N.E.2d 277, 281 (1976)).

Another critical factor which must be examined is the living arrangements and potential presence of Wilbur White in Jeffrey's life, and the ability of the mother (or the lack thereof) to adequately protect Jeffrey. While the record in this case is very limited as to the actual harm that Mr. White has inflicted on Jeffrey, the various orders, psychological reports, court summaries, and recommendations from the guardian ad litem all concur on one point—Wilbur White's presence is harmful to Jeffrey. The failure of the mother to comply with earlier court orders not to permit Mr. White in the home with Jeffrey may also be considered on remand. The home study submitted to this Court on February 10, 1995, includes information that attempts made to verify Mr. White's current residence indicate that Mr. White receives his mail at the same address at which Appellant currently resides. This fact alone may,

upon introduction of proper evidence verifying that Mr. White does pose a continuing problem with regards to Jeffrey, prevent Appellant from receiving custody of Jeffrey. Clearly, it would be disastrous to permit Jeffrey to return to his mother's home on a permanent basis without resolving this issue of Mr. White's presence and the potential that his presence, permanent or sporadic, would have a deleterious effect on Jeffrey's continued progress.

Should the court eventually determine that Jeffrey should be reunified with his mother, such change should be accomplished with a sufficient gradual transition period to enable Jeffrey to accept such change with as little upheaval as possible to his life. *See* Syl.Pt. 3, *James M.*, 185 W.Va. at 649, 408 S.E.2d at 401 (recognizing need for gradual transition when permanent custodial arrangements are altered.) [42]

In *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995), we recently pointed out that West Virginia Code § 49–6–1 (1995) sets forth mandatory notice requirements in abuse and neglect cases.[43] In the instant case, it appears that the rights of Wilbur White were terminated without any allegation of abuse or neglect. Indeed, such rights appear to have been terminated on the basis of a finding of abandonment without there ever having been a formal allegation of abandonment.[44] Although the issue of the rights of Wilbur White are not before the Court at this time, we urge the lower court on remand to clean up the record, if not for the father's benefit (who from the record before us has indicated very little interest in the child), at least for Jeffrey's benefit.

■ We spoke with disapproval in *Christina L.* of the practice of not including allegations of abandonment in petitions for abuse and neglect, effectively leaving the child's legal status in limbo. In syllabus point six of *Christina L.*, we said: "When the West Virginia Department of Health and Human Resources seeks to terminate parental rights where an absent parent has abandoned the child, allegations of such abandonment should be included in the petition and every effort made to comply with the notice requirements of W.Va.Code, 49–6–1 (1992)." If the rights of the father were terminated without due process, Jeffrey's future status could be subject to challenge.

### V. Right of Child to Continued Association

■ In the event the proceedings on remand result in a termination of Appellant's parental rights, the court should consider whether the child should have continued visitation with his mother and/or his siblings, notwithstanding the termination of rights. Previously, this Court recognized the need

**42.** Based on Appellant's comment that she would need time to get reacquainted with Jeffrey when questioned in connection with the home study that was prepared at the direction of this Court, even she is cognizant of the need to gradually work towards any reunification or extended visitation period.

**43.** West Virginia Code § 49–6–1(b) states:

The petition and notice of the hearing shall be served upon both parents and any other custodian, giving to such parents or custodian at least ten days' notice, and notice shall be given to the state department. In cases wherein personal service within West Virginia cannot be obtained after due diligence upon any parent or other custodian, a copy of the petition and notice of the hearing shall be mailed to such person by certified mail, addressee only, return receipt requested, to the last known address of such person. If said person signs the certificate, service shall be complete and said certificate shall be filed as proof of said service with the clerk of the circuit court. If service cannot be obtained by personal service or by certified mail, notice shall be by publication as a Class II legal advertisement in compliance with the provisions of article three [§ 59–3–1 et seq.], chapter fifty-nine of this code. A notice of hearing shall specify the time and place of the hearing, the right to counsel of the child and parents or other custodians at every stage of the proceedings and the fact that such proceedings can result in the permanent termination of the parental rights. Failure to object to defects in the petition and notice shall not be construed as a waiver.

**44.** As we pointed out in syllabus point two of *James M.*: "Abandonment of a child by a parent(s) constitutes compelling circumstances sufficient to justify the denial of an improvement period." 185 W.Va. at 649, 408 S.E.2d at 401. And as we further pointed out in *Christina L.*, it also constitutes grounds for termination of parental rights. However, such abandonment must be alleged and proven.

**638**

for continuing association between siblings or step-siblings following a parental rights termination in syllabus point four of *James M.:*

> In cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact.

185 W.Va. at 649, 408 S.E.2d at 401. We recently extended this concept to include the possibility of visitation between the child and the parent whose rights have been terminated for abuse or neglect:

> When parental rights are terminated due to neglect or abuse, the circuit court may nevertheless in appropriate cases consider whether continued visitation or other contact with the abusing parent is in the best interest of the child. Among other things, the circuit court should consider whether a close emotional bond has been established between parent and child and the child's wishes, if he or she is of appropriate maturity to make such request. The evidence must indicate that such visitation or continued contact would not be detrimental to the child's well being and would be in the child's best interest.

*Christina L.,* 194 W.Va. at 446, 448, 460 S.E.2d 692, 694 Syl. Pt. 5.

Accordingly, in the event that Appellant's parental rights are re-terminated, the court may consider awarding visitation rights to her consistent with the considerations identified in *Christina L.* If the court eventually returns custody to Appellant, it should inquire into the relationship Jeffrey has formed with his foster parents and, if it is in his best interests, fashion a plan for continued association between the foster parents and the child. As we said in *Honaker v. Burnside,* 182 W.Va. 448, 388 S.E.2d 322 (1989), a child has a right to continued association with those to whom he has formed an emotional bond. *Id.* at 452–53, 388 S.E.2d at 325–26.

Based on the foregoing, we hereby reverse the decision of the Circuit Court of Ohio County and remand this matter for further proceedings consistent with this opinion.

Reversed and remanded.

BROTHERTON and RECHT, JJ., did not participate.

FOX, J., sitting by temporary assignment.