591 S.E.2d 215

**In re DESARAE M., Destiny M. and Britney M.**

**No. 31432.**

Supreme Court of Appeals of West Virginia.

Submitted Nov. 5, 2003.

Decided Dec. 2, 2003.

Concurring and Dissenting Opinion of Justice Davis, Dec. 9, 2003.

Davis, J., concurred in part, dissented in part, and filed a separate opinion.

Karen L. Garrett, Garrett & Garrett, Moorefield, for the Appellant, Shannon R., Mother.

Darrell V. McGraw, Jr., Attorney General, Charleston, C. Carter Williams, Assistant Attorney General, Petersburg, for the Appellee, West Virginia Department of Health and Human Resources.

Joyce E. Stewart, Guardian ad Litem, Moorefield, for the children, Desarae M., Destiny M. and Britney M.

PER CURIAM.

This is an appeal by Shannon R.[1] (hereinafter "Appellant") from a final order of the Circuit Court of Hampshire County terminating her parental rights to her three children, Britney, Destiny, and Desarae M.[2] The Appellant appeals that termination order to this Court, alleging that the lower court committed several reversible errors. Upon thorough evaluation of the record, briefs, and arguments of counsel, we reverse the determination of the lower court and remand for one additional improvement period to be conducted in compliance with applicable statutory mandates and consistent with this opinion.

### I. Factual and Procedural History

The Appellant and Dwayne M.[3] are the biological parents of Destiny, Britney, and Desarae M. On March 9, 2002, Desarae, then two years of age, was admitted to Hampshire Memorial Hospital in Romney, West Virginia, suffering from anemia and vomiting. She was then transferred to Cumberland Memorial Hospital in Cumberland, Maryland. Examining physicians observed that Desarae had suffered a double fracture of her left leg which had been placed in a cast on March 1, 2002. Desarae also had a bruise on her forehead; a scar between her eyes which resembled the pattern of her leg cast; several bruises on her thighs, knees, back, upper abdomen, and calves; and severe abdominal pain due to a mass in her stomach which resulted from a pancreatic split due to something striking Desarae with blunt force.[4] The Appellant was unable to explain the origin of these wounds, except to state that Desarae had been bouncing on a stair step. Likewise, the mother failed to provide a ex-

planation for the abdominal bruising, except to state that this injury may have occurred at the same time Desarae broke her leg. Moreover, the Appellant's accounts of the injury and who may have witnessed the injury were inconsistent. She first said that only children had witnessed the incident; she later indicated that her boyfriend, Victor, was with the children when the incident occurred. Britney, the oldest child, indicated that both her mother and Victor were home when the incident occurred.

Desarae was subsequently transferred to Ruby Memorial Hospital in Morgantown, West Virginia.[5] She was also transported to Pittsburgh Children's Hospital in Pittsburgh, Pennsylvania, for a period of approximately one week before returning to Ruby Memorial Hospital. Including all four hospitals, Desarae was hospitalized from March 9, 2002, through April 29, 2002.

On March 11, 2002, the Department of Health and Human Resources (hereinafter "DHHR") filed an application for emergency custody, alleging imminent danger to all three children. On March 13, 2002, the DHHR filed an Abuse and Neglect Petition requesting that custody of all three children be placed with the DHHR. The DHHR alleged that all three children were "abused and neglected children primarily based upon the unexplained multiple and serious injuries to Desarea and the failure of [the mother] to provide the children with needed medications and supervision." Attorney Joyce Stewart was appointed as guardian ad litem for the children. Attorney Karen Garrett was appointed to represent the Appellant, and At-

---

1. We follow our past practice in juvenile and domestic relations cases which involve sensitive facts and do not utilize the last names of the parties. See, e.g., West Virginia Dept. of Human Services v. La Rea Ann C.L., 175 W.Va. 330, 332 S.E.2d 632 (1985).

2. Britney was born on March 20, 1996; Destiny was born on May 28, 1998; and Desarae was born on January 26, 2000.

3. Dwayne M. is currently incarcerated in Maryland until 2024 for attempted murder and robbery, and we consequently do not address any issues surrounding the termination of his parental rights to these children. While the father has

not appealed, and we therefore do not have a complete record regarding the father, it appears that Dwayne M. refused service of process at the prison in which he was incarcerated.

4. Desarae also suffered anemia. Her medical history revealed that she had been prescribed iron drops; however, the Appellant admitted that she had not given the iron drops to Desarae routinely because she thought Desarae was gagging on the drops.

5. While visiting Desarae at Ruby Memorial, the Appellant was arrested on a 1999 outstanding burglary warrant from Hampshire County, West Virginia, and she subsequently posted bond.

torney William Keaton was appointed to represent the children's father, Dwayne M.

Psychologist Renee Harris began working with the children in April 2002 and reported that Destiny had indicated that she had been subjected to sexual abuse by the Appellant's boyfriend. Subsequent medical examinations of Destiny and Britney were inconclusive regarding the alleged sexual abuse. On May 2, 2002, the lower court conducted an adjudicatory hearing and received testimony from Child Protective Services Worker Susan Wilt regarding her visit to Desarae at Cumberland Memorial Hospital and subsequent experience in this matter. The lower court also entertained telephonic testimony concerning Desarae's injuries from Dr. Peter Ehrlich, a pediatric surgeon in Morgantown, West Virginia. Dr. Susan Nuber of Cumberland, Maryland, also testified telephonically and explained her findings regarding Desarae's injuries. Both physicians opined that Desarae's injuries were caused by physical abuse rather than accidental means. The Appellant also testified at this hearing, maintaining that neither she nor her boyfriend, Victor, had caused any of Desarae's injuries. At the conclusion of the adjudicatory hearing, the lower court found that Desarae was an abused and neglected child.

During a May 29, 2002, hearing, the lower court granted the Appellant an improvement period[6] and placed goals and requirements for such improvement period on the record.[7] A formal family case plan, as required by West Virginia Code § 49–6D–3(a) (1984) (Repl.Vol.2001), was not submitted.

The record reveals multiple areas of difficulty and delay encountered by all parties during the improvement period. One of the most troubling issues is the Appellant's apparent lack of ability to remove herself from the relationship with her boyfriend, Victor. Counsel for the Appellant informed the lower court during the May 29, 2002, hearing that her client had chosen her children over her boyfriend, but economic limitations had made it difficult to remove herself from the home she and Victor shared.

The Appellant also alleges that personnel shortages within DHHR limited her success during her improvement period. She emphasizes an incident in September 2002 in which the children were not transported to the designated visitation site for visitation. The caseworkers had apparently terminated their employment with the DHHR and alternate arrangements had not been made.

The Appellant was initially counseled by Mr. Greg Trainor but was requested by the DHHR to begin counseling with Cindy Hay since Ms. Hay had conducted some parenting classes in which the Appellant had participated. The Appellant asserts that her counseling sessions were limited since the therapist was on vacation from July 15, 2002, through August 5, 2002.

During a September 2002 MDT meeting, the Appellant reported that she had maintained a job for two weeks at a gas station store in Winchester, Virginia. Although the Appellant alleged that she had not seen Victor for a few months, members of Victor's family had allegedly informed the DHHR that Victor had been staying with the Appellant. The DHHR also presented a letter from the Appellant to Victor, written in September 2002, in which she had told Victor that she wanted to have a child with him. The Appellant was also incarcerated in Baltimore City Jail on a warrant for Failure to Appear at a scheduled court hearing.

On December 18, 2002, the lower court conducted a dispositional hearing and heard testimony from the individual counselor providing services to the Appellant, the therapist for the children, a representative from Family Preservation Services, and a caseworker

---

**6.** The guardian ad litem for the children objected to the improvement period based upon the Appellant's continued relationship with Victor and her denial of abuse to Desarae. The guardian ad litem also asserted that the Appellant had not located a permanent place of residence or employment and that service workers had found it difficult to contact the Appellant to schedule services.

**7.** Pursuant to these requirements, the Appellant was to become gainfully employed, to visit with the children, to continue parenting classes, to continue individual therapy, to obtain permanent housing, and to continue to participate in in-home services.

from the DHHR. The evidence revealed that the Appellant was unable to locate steady employment during the improvement period, continued to maintain some degree of relationship with Victor, and failed to follow through with all therapy goals. Guardian ad litem Joyce Stewart, DHHR caseworkers, the therapist for children, and therapist for mother all indicated that termination of parental rights was in best interest of children. The lower court found that, pursuant to West Virginia Code § 49–6–5(6), there was no reasonable likelihood that the conditions of neglect or abuse could be substantially corrected in the near future, and the Appellant's parental rights were terminated to all children by order dated January 29, 2003.

The Appellant appeals the termination of parental rights, alleging that the lower court erred by (1) allowing physicians from Morgantown, West Virginia, and Cumberland, Maryland, to testify at the adjudicatory hearing through a telephonic conference; (2) failing to require the DHHR to prepare an individualized family case plan; (3) erroneously ruling that the conditions of neglect or abuse cannot be corrected; (4) failing to recognize a conflict of interest of a DHHR worker because she had previously worked in the Appellant's home; (5) failing to grant a less restrictive alternative; (6) allowing a psychologist for Britney and Destiny to testify regarding the statements of the children on the issue of sexual abuse; (7) terminating her parental rights to Britney and Destiny despite the absence of an adjudication finding them to be neglected or abused; (8) refusing to permit counsel for the Appellant to argue a motion for return of custody of Britney and Destiny.

## II. Standard of Review

■ In reviewing the proceedings conducted in the lower court and the lower court's resolution of this matter, this Court is guided by the two-prong deferential standard enunciated in syllabus point one of *State v. Michael M.*, 202 W.Va. 350, 504 S.E.2d 177 (1998), as follows: " 'When this Court reviews challenges to the findings and conclusions of the circuit court, a two-prong deferential standard of review is applied. We review the final order and the ultimate disposition under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard.' Syl. Pt. 1, *McCormick v. Allstate Insurance Company*, 197 W.Va. 415, 475 S.E.2d 507 (1996)."

## III. Discussion

### A. Failure to Formulate Family Case Plan

At the outset, our evaluation of this record guides us to the firm conviction that the record of the adjudicatory hearing is totally supportive of the findings of abuse and neglect notwithstanding any deficiency in the circumstances under which the telephonic testimony of the two physicians was received. It is beyond doubt that the children who are the subject of this case are abused and neglected children. Of the multitude of alleged errors asserted by the Appellant, however, our evaluation reveals that the Appellant's most compelling argument is the absence of a statutorily-required family case plan.[8] We therefore proceed to address two significant assignments of error presented by the Appellant because it is apparent from the record that the Appellant is entitled to an additional opportunity to put forth a genuine effort to preserve her parental relationship with these children.

The Appellant alleges, and the State concedes, that a family case plan, as envisioned and mandated by West Virginia Code § 49–6D–3(a), was not formulated in the present case. The State maintains that a list of goals and requirements for the improvement period placed on the record by the lower court satisfied the "spirit," if not the "letter," of the law. We disagree. A formal family case plan, as mandated by West Virginia Code § 49–6D–3(a), is not only for the benefit and information of the parent seeking improvement; it is equally beneficial and necessary for the caseworkers and other assistive per-

---

**8.** We address only two assignments of error: the absence of the family case plan, upon which we are premising the reversal and remand, and the failure of the lower court to specifically find that Destiny and Britney were abused children. We find no merit to the other assignments of error forwarded by the Appellant and decline to address those issues.

sonnel. Without a family case plan, the individuals seeking to assist a parent are limited in their ability to formulate distinct goals, methods of achieving such goals, or means by which success will be judged. While we applaud the lower court for attempting to clarify matters by placing specific goals upon the record in open court, such means of clarification could have been used in conjunction with the implementation of a family case plan but should not have been employed to the exclusion thereof.

 This Court has repeatedly examined the benefits of a family case plan and the statutory requirement for the family case plan as an important component of an improvement period. *See In re Jamie Nicole H.*, 205 W.Va. 176, 182, 517 S.E.2d 41, 47 (1999) ("Pursuant to West Virginia Code § 49–6D–3 (1998), a family case plan must be developed by the DHHR and submitted to the circuit court"). In syllabus point five of *State ex rel. Department of Human Services v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987), we explained that "[t]he purpose of the family case plan as set out in W.Va.Code, 49–6D–3(a) (1984), is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems." Syllabus point three of *Cheryl M.* stated: "Under W.Va.Code, 49–6–2(b) (1984), when an improvement period is authorized, then the court by order *shall require* the Department of Human Services to prepare a family case plan pursuant to W.Va.Code, 49–6D–3 (1984)." 177 W.Va. at 688, 356 S.E.2d at 181 (emphasis supplied). Syllabus point four of *Cheryl M.* continued as follows: "Under W.Va.Code, 49–6D–3 (1984), the Department of Human Services is required to prepare a family case plan with participation by the parties and their counsel and to submit it to the court for approval within thirty days."

In *Cheryl M.*, somewhat similar to the case at bar, the lower court and the Department of Human Services had failed to formulate a family case plan.[9] This Court in *Cheryl M.* emphasized that a family case plan "is de-

signed to foreclose a natural parent from being placed in an amorphous improvement period where there are no detailed standards by which the improvement steps can be measured." 177 W.Va. at 693–94, 356 S.E.2d at 186–87. The *Cheryl M.* Court also noted that the family case plan "also provides a meaningful blueprint that the [DHHR] can monitor and which will also give the court specific information to determine whether the terms of the improvement period were met. Without such a plan, a court is then confronted with general testimony as to whether the natural parent has shown the requisite 'improvement.'" 177 W.Va. at 694, 356 S.E.2d at 187.

In *Cheryl M*, this Court provided the following explanation of the importance of the family case plan:

The point that bears emphasizing is that under W.Va.Code, 49–6–2(b), the family case plan is triggered when a court orders an improvement period. Here, the court took no formal action to order an improvement period and, as a consequence, there was never any court-approved family case plan as required by W.Va.Code, 49–6D–3(b).

It must be remembered that W.Va.Code, 49–6D–3, is a part of a larger enactment known as the West Virginia Child Protective Services Act (CPSA), W.Va.Code, 49–6D–1, *et seq.* Its purpose and intent are set out in W.Va.Code, 49–6D–2, which emphasizes that "the intention of the legislature [is] to provide for the removal of a child from the custody of the child's parents only when the child's welfare cannot be otherwise adequately safeguarded." (Emphasis added).

177 W.Va. at 694, 356 S.E.2d at 187.

 This Court in *Cheryl M.* also addressed the issue of rigorous compliance with statutory mandates and quoted the following language from a Connecticut case, *In re Juvenile Appeal,* 177 Conn. 648, 420 A.2d 875 (1979):

---

9. In *Cheryl M.*, unlike the case at bar, the lower court had also refused to grant an improvement period. This Court in *Cheryl M.* reversed and

remanded based upon the absence of the family case plan and the denial of the improvement period. 177 W.Va. at 695, 356 S.E.2d at 188.

Insistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interests of the child. Rather, it enhances the child's best interests by promoting autonomous families and by reducing the dangers of arbitrary and biased decisions amounting to state intrusion disguised under the rubric of the child's "best interests."

420 A.2d at 886–87. We also explained as follows in syllabus point four of *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991):

In formulating the improvement period and family case plans, courts and social service workers should cooperate to provide a workable approach for the resolution of family problems which have prevented the child or children from receiving appropriate care from their parents. The formulation of the improvement period and family case plans should therefore be a consolidated, multi-disciplinary effort among the court system, the parents, attorneys, social service agencies, and any other helping personnel involved in assisting the family.

*Id.* at 616, 408 S.E.2d at 368. We further explained as follows in *Carlita B.*:

The goal [of improvement periods and case plans] should be the development of a program designed to assist the parent(s) in dealing with any problems which interfere with his ability to be an effective parent and to foster an improved relationship between parent and child with an eventual restoration of full parental rights a hoped-for result. The improvement period and family case plans must establish specific measures for the achievement of these goals, as an improvement period must be more than a mere passage of time. It is a period in which the D.H.S. and the court should attempt to facilitate the parent's success, but wherein the parent must understand that he bears a responsibility to demonstrate sufficient progress and improvement to justify return to him of the child.

*Id.* at 625, 408 S.E.2d at 377.

█ The record in this case indicated that extreme cruelty was inflicted upon Desarae.

Despite the egregiousness of these accusations, however, once the lower court grants an improvement period, certain procedural requirements have to be followed. It is very tempting to circumvent the statutory requirement by focusing upon the severity of abuse, the absence of clear indication that the mother is capable of improvement even given a concise family case plan, or the recalcitrance of the mother in removing herself from the relationship with the alleged abuser. Indeed, these are compelling arguments. The fact remains, however, that the Legislature has set forth certain requirements, explained in detail in the statutes, for the proper conduct of an improvement period during an abuse and neglect proceeding. A preeminent factor is the preparation and adoption of a family case plan.

One of the purposes served by such a family case plan is the identification not only of goals but of specific means of measuring progress or the lack of progress toward those goals. A properly prepared and implemented family case plan provides the parent or parents, the DHHR, and the court with a means of measuring progress and effort, of dealing promptly with failure to provide or avail oneself of services, or in the best of circumstances, of documenting successful completion of an improvement effort. By contrast, a mere recital of goals, as included on the record in this case, may lead, as it has here, to conflicting testimony about which, if any, goals were met or the degree to which such goals were met. It may also lead to uncertainty regarding whether the failure to achieve one or more of the goals arises from mere obstinacy, the lack of or interruption of services to the family, or some other cause or circumstances.

This Court concludes that we cannot overlook the requirement of a family case plan in this case where it is crystal clear that none was prepared and there is substantial evidence that oversight of the family's progress was simply non-existent during the weeks in which there were no DHHR caseworkers available to monitor that progress. Moreover, we believe it inappropriate to overlook the absence of a family case plan in this case,

lest courts, workers, and families who strive to meet designated requirements and work through such plans come to view such plans as optional rather than the mandatory tools our statute envisions.

Based upon the foregoing, we find that the lower court committed reversible error in failing to require a family case plan as mandated by West Virginia Code § 49–6D–3. In an effort to formulate an appropriate remedy for this error, we instruct the lower court, on remand, to grant one final six-month improvement period to the Appellant. Such improvement period shall include the formulation and implementation of a family case plan. While we require a new improvement period in lieu of the one previously awarded, we heartily endorse the past efforts of the lower court to require strict compliance by the Appellant with the factors which the lower court deemed to be critically important to the Appellant's success. Accordingly, notwithstanding our grant of a new improvement period, the Appellant must be aware that this is essentially a last opportunity. The circuit court retains discretion to terminate the new improvement period and enter an order terminating the Appellant's parental rights to all three children if, at any time during such improvement period, the lower court finds that (1) the Appellant has resumed a relationship with Victor M. (2) has failed to provide permanent housing for the children, or (3) has failed to maintain steady employment.

While we do not anticipate that a family case plan would include a provision for immediate reunification, we caution that based upon the length of separation between the mother and children, the family case plan, as well as any subsequent reunification plan, must provide for the gradual development of parental contacts with the children at a pace and in circumstances specifically reviewed and approved by the trial court. In a later section of this opinion, we address the question of reunification at the conclusion of the improvement period, if such reunification is deemed appropriate by the lower court. We leave it to the discretion of the lower court to assure that any contacts during the improvement period are developed in a gradual and orderly manner to minimize the trauma to the children. Finally, at the conclusion of the improvement period, the circuit court must make such dispositional order as it deems appropriate under its findings of fact and conclusions of law then found and determined.

### B. Termination of Rights to Britney and Destiny

The Appellant assigns error to the lower court's termination of parental rights to Britney and Destiny without an explicit finding of abuse and neglect of these children in the adjudicatory order. While the favorable practice would be to place an explicit explanation for this action on the record, we do not find reversible error in this matter. The statutory basis for the lower court's termination of parental rights to Britney and Destiny is solid and indisputable. In syllabus point two of *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995), this Court held as follows: "Where there is clear and convincing evidence that a child has suffered physical and/or sexual abuse while in the custody of his or her parent(s), guardian, or custodian, another child residing in the home when the abuse took place who is not a direct victim of the physical and/or sexual abuse but is at risk of being abused is an abused child under W.Va.Code, 49–1–3(a) (1994)." West Virginia Code § 49–1–3(a) (1994) (Repl.Vol. 2001) states as follows:

"Abused child" means a child whose health or welfare is harmed or threatened by:

(1) A parent, guardian or custodian who knowingly or intentionally inflicts, attempts to inflict or knowingly allows another person to inflict, physical injury or mental or emotional injury, upon the child or another child in the home; or

(2) Sexual abuse or sexual exploitation[.]

We explained as follows in *Christina:*

We find that the language of the statute is clear on its face. The West Virginia Legislature plainly articulated its intention that "an 'abused child' means a child whose health or welfare is harmed or threatened by" the abuse inflicted upon "another child in the home." Under the statute, there need not be a showing by the Department that each child in the home is directly

abused, either sexually or physically, before termination of parental rights is sought.

194 W.Va. at 452, 460 S.E.2d at 697–98 (footnote omitted).

### C. Subsequent Reunification of the Family, If Deemed Appropriate

If the Appellant satisfies the requirements of the improvement period, including both the requirements set forth above and additional requirements implemented in the family case plan, and the lower court determines that reunification of the family is appropriate, such reunification should be accomplished through a gradual, orderly plan of transition. As this Court explained in syllabus point three of *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991):

It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians. Lower courts in cases such as these should provide, whenever possible, for a gradual transition period, especially where young children are involved. Further, such gradual transition periods should be developed in a manner intended to foster the emotional adjustment of the children to this change and to maintain as much stability as possible in their lives.

If, however, reunification is not suitable, the lower court should consider the possibility of post-termination sibling contact, as explained in syllabus point four of *James M.*, as follows: "In cases where there is a termination of parental rights, the circuit court should consider whether continued association with siblings in other placements is in the child's best interests, and if such continued association is in such child's best interests, the court should enter an appropriate order to preserve the rights of siblings to continued contact."

### IV. Conclusion

Based upon the foregoing reasoning, we reverse the termination of parental rights ordered by the lower court and remand for the implementation of a final six-month improvement period, with conditions as outlined above. As this Court explained in syllabus point six of *Carlita B.*,

At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

185 W.Va. at 616, 408 S.E.2d at 368. If the Appellant fails to comply with the required conditions, the lower court shall immediately conclude the improvement period and make such further order as it deems appropriate, which may include an order that the Appellant's parental rights to all three children be terminated.

Reversed and Remanded with Directions.

Justice DAVIS concurs in part and dissents in part and reserves the right to file a separate opinion.

DAVIS, J., concurring, in part, and dissenting, in part.

(Filed Dec. 9, 2003)

I agree with the majority's decision insofar as it concluded that family case plans are an integral and necessary part of a parent's improvement period in abuse and neglect cases. However, I dissent from the majority's ultimate conclusion that the failure to develop a formal family case plan in this case was reversible error insofar as the conditions of the appellant mother's improvement period were clearly communicated to her; she nevertheless failed to achieve those goals; and there is no evidence that, during this additional improvement period, she will be likely to successfully correct the conditions of abuse and neglect with which she has been charged.[1]

---

**1.** *See* Syl. pt. 3, in part, *In re Jeffrey R.L.*, 190 W.Va. 24, 435 S.E.2d 162 (1993) ("Parental rights may be terminated where there is clear and convincing evidence that the infant child has suffered extensive physical abuse while in the custody of his or her parents, and there is no

I am most troubled, however, by the potentially devastating effect that the majority's Opinion will have on the most important parties to this proceeding–the children of the appellant for whose benefit and safety the underlying abuse and neglect proceedings were initiated. Time and again we have reiterated that abuse and neglect cases must be given the utmost attention to ensure their prompt resolution in order to provide permanency for the children involved therein. "Child abuse and neglect cases must be recognized as being among the highest priority for the courts' attention. Unjustified procedural delays wreak havoc on a child's development, stability and security." Syl. pt. 1, in part, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 (1991). *Accord In re Stephen Tyler R.*, 213 W.Va. 725, 733 n. 11, 584 S.E.2d 581, 589 n. 11 (2003); *In re Daniel D.*, 211 W.Va. 79, 95, 562 S.E.2d 147, 163 (2002) (Davis, C.J., dissenting); *In re Edward B.*, 210 W.Va. 621, 635 n. 20, 558 S.E.2d 620, 634 n. 20 (2001); Syl. pt. 4, *In re Emily*, 208 W.Va. 325, 540 S.E.2d 542 (2000); Syl. pt. 2, *In re Michael Ray T.*, 206 W.Va. 434, 525 S.E.2d 315 (1999); *State v. Michael M.*, 202 W.Va. 350, 356 n. 14, 504 S.E.2d 177, 183 n. 14 (1998); Syl. pt. 3, *In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996); Syl. pt. 5, *In re Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995); *State ex rel. S.C. v. Chafin*, 191 W.Va. 184, 191, 444 S.E.2d 62, 69 (1994); Syl. pt. 3, *Boarman v. Boarman*, 190 W.Va. 533, 438 S.E.2d 876 (1993); *Mary D. v. Watt*, 190 W.Va. 341, 346, 438 S.E.2d 521, 526 (1992). *See also State v. Michael M.*, 202 W.Va. at 356 n. 14, 504 S.E.2d at 183 n. 14 ("[W]e reemphasize that decisions about the permanent placement of a child should not be delayed unnecessarily."); Syl. pt. 5, *In re Carlita B.*, 185 W.Va. 613, 408 S.E.2d 365 ("The clear import of the statute [West Virginia Code § 49–6–2(d)] is that matters involving the abuse and neglect of children shall take precedence over almost every other matter with which a court deals on a daily basis, and it clearly reflects the goal that such proceedings must be resolved as expeditiously as possible.").

We have recognized this need for immediate disposition in an attempt to shield the children subject to such proceedings from the extreme trauma they face when they are first removed from their parents' home, then shuttled to numerous foster placements, and finally are placed into a permanent home or returned to their parents upon the conclusion of such proceedings. *See* Syl. pt. 3, in part, *James M. v. Maynard*, 185 W.Va. 648, 408 S.E.2d 400 (1991) ("It is a traumatic experience for children to undergo sudden and dramatic changes in their permanent custodians."). *See also David M. v. Margaret M.*, 182 W.Va. 57, 64, 385 S.E.2d 912, 919 (1989) (observing that "[c]hildren under six years of age are called 'children of tender years'" because "[t]hey are the most dependent on their parents").

Had there been any indication that the appellant herein was a fit and suitable mother for her children or that she could correct the conditions of abuse and neglect with which she has been charged, I would wholeheartedly agree with the majority's attempt to protect and preserve her parental rights. *See* Syl. pt. 6, *State ex rel. Jeanette H. v. Pancake*, 207 W.Va. 154, 529 S.E.2d 865 (2000) ("'"In the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody [of] his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions." Syllabus Point 1, *In Re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973).' Syllabus point 1, *In Interest of Betty J.W.*, 179 W.Va. 605, 371 S.E.2d 326 (1988)."); Syl. pt. 6, *State ex rel. Diva P. v. Kaufman*, 200 W.Va. 555, 490 S.E.2d 642 (1997) (same). *See generally Kessel v. Leavitt*, 204 W.Va. 95, 511 S.E.2d 720 (1998) (protecting biological father's parental rights through recognition of cause of action for tortious interference with parental relationship).

Sadly, though, such evidence is not before us, and the majority has even conceded that "the record of the adjudicatory hearing is

reasonable likelihood that the conditions of

abuse can be substantially corrected[.]'").

totally supportive of the findings of abuse and neglect .... It is beyond doubt that the children who are the subject of this case are abused and neglected children." Maj. op., *supra* at 662, 591 S.E.2d at 220. Despite this recognition, however, the majority has blatantly refused to acknowledge the paramount consideration at issue in this case: the best interests of the appellant's minor children. "Although parents have substantial rights that must be protected, the primary goal in cases involving abuse and neglect, as in all family law matters, must be the health and welfare of the children." Syl. pt. 3, *In re Katie S.*, 198 W.Va. 79, 479 S.E.2d 589 (1996). *See also* Syl. pt. 7, *In re Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 ("Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren)."); *Michael K.T. v. Tina L.T.*, 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children."); *David M. v. Margaret M.*, 182 W.Va. at 60, 385 S.E.2d at 916 ("[A]ll parental rights in child custody matters are subordinate to the interests of the innocent child.").

Mindful of the best interests of Desarae, Destiny, and Britney and the need to provide them with the safe and secure home which they so rightfully deserve, I respectfully dissent from the majority's decision to grant the appellant an additional improvement period. Such an award can serve no purpose other than to prolong the dangerous and uncertain living conditions these three little girls have far too long already endured.

For the foregoing reasons, I respectfully concur, in part, with and dissent, in part, from the Opinion of the Court.