**STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS**

*In re* **Z.A. and M.A.**

**No. 21-0851** (Randolph County 19-JA-187 and 19-JA-189)

**MEMORANDUM DECISION**

Petitioner Father H.A., by counsel J. Brent Easton, appeals the Circuit Court of Randolph County's September 20, 2021, order terminating his parental rights to Z.A. and M.A.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Patrick Morrisey and Lee Niezgoda, filed a response in support of the circuit court's order. The guardian ad litem ("guardian"), Heather M. Weese, filed a response on the children's behalf in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in finding that he failed to complete the terms and conditions of his improvement period and in terminating his parental rights when the DHHR failed to make reasonable efforts to reunify the family or develop a family case plan.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In December of 2019, the DHHR filed a child abuse and neglect petition alleging that petitioner and the mother had created deplorable living conditions and exposed the children to an unsafe and unhygienic living environment. According to the petition, the DHHR received a referral stating that the home had no running water and that the children were filthy. Additionally, the referral alleged that then-one-year-old Z.A. had a "rattle" when breathing and that the parents had

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990). Another child, W.D., is a half-sibling to the above children. W.D. was included in the original caption of the case but has been removed as this child is not at issue in this appeal.

failed to take him to get medical care. The referral also stated that the mother regularly shot small animals from the windows of the home.

Upon investigating the referral, Child Protective Services ("CPS") workers visited the home. They observed a large gap between the porch and the front door, which revealed various animal bones. The inside of the home was very cold and smelled foul with urine and feces. The home was unclean with cobwebs and stacks of soiled clothing littered throughout. The children were also malodorous. The workers learned that the home had no working commode as it had previously "fallen through the floor" and the family had been relieving themselves in uncovered buckets inside the home. The children's rooms were filthy and cluttered, with the windows open during freezing temperatures. When asked why the windows were left open, the mother explained that petitioner had not "gotten a chance to close them yet." The workers observed a ceiling fan in another room that had fallen down and exposed the electrical wiring and insulation. Regarding the concerning "rattling noise" the baby made when breathing, the mother reported that this was due to a genetic condition that her other children also had, but she gave no diagnosis. The mother admitted that she failed to obtain medical treatment for the children. Based on these facts, the DHHR alleged that the children were abused and neglected.

The circuit court held an adjudicatory hearing in January of 2020, wherein petitioner stipulated to the allegations in the petition. The circuit court accepted petitioner's stipulation and adjudicated him as an abusing parent. Thereafter, on March 5, 2020, the court granted petitioner a post-adjudicatory improvement period, the terms of which included the following: 1) attend all multidisciplinary team ("MDT") meetings; 2) complete all services as required by the MDT, such as parenting education sessions, adult life skills classes, and individualized therapy; 3) provide honest information and update the MDT members with any changes in address or employment; 4) undergo a parental fitness and psychological evaluation; 5) demonstrate the ability and knowledge to appropriately parent, supervise, and protect the children; 6) obtain and maintain a clean, safe, and appropriate living environment; 7) obtain and maintain employment; 8) remain alcohol and substance free; and 8) participate in all supervised visitations. These terms were reduced to writing, signed by petitioner and the other MDT members, and filed with the court.

In October of 2020, the MDT agreed to suspend supervised visits with the children in light of their severe negative behaviors and trauma-related symptoms surrounding visits with the parents. Also that month, petitioner underwent a parental fitness and psychological evaluation with Dr. Edward Baker, who opined that petitioner lacked sufficient parental capacity to care, protect, and change in order to provide adequate care for his children and that his prognosis for improving his ability to parent was "guarded." By January of 2021, the court ordered that the terms of petitioner's improvement period be modified to require him to complete anger management classes within his individualized counseling.

The court held a status hearing in March of 2021, wherein the DHHR presented evidence that after ceasing visits with the parents, the children's negative behaviors improved, but after visits were reinstated, the negative behaviors returned. According to the certified docket sheet, the DHHR filed a family case plan on March 12, 2021. Also, in June of 2021, the DHHR filed its motion to terminate petitioner's parental rights as well as an updated family case plan.

The circuit court held final dispositional hearings in June, July, and September of 2021. At the June hearing, M.A.'s therapist testified that then-five-year-old M.A. initially described petitioner and the mother as her "old daddy" and "old mommy" but within the past couple of months referred to them only as her half-sibling's parents. The foster mother stated that M.A. told her she did not want to visit with petitioner and the mother, and that after visits, M.A.'s behaviors were defiant and oppositional. Most concerningly, after visits with petitioner, M.A. would smear her feces, urinate on herself, and kick and hit others. The therapists stated that M.A. exhibited an outburst during an instance when petitioner was buckling her into a car seat after a visit. The therapist opined that M.A.'s speech regressed after visits and that M.A.'s behaviors were consistent with having experienced trauma and stress. She explained that during periods of no visitation, M.A.'s behaviors improved, and M.A. was more open and talkative during therapy sessions.

Next, Dr. Edward Baker, the clinical psychologist who performed petitioner's psychological evaluation, testified that petitioner was defensive during the examination as he "minimally cooperated, [and] gave as little information as he possibly could to complete the assessment" during the fifty-five minute to an hour-and-a-half-long interview. Dr. Baker noted that petitioner had some traits suggestive of anger management issues and a lack of cooperation. He rated petitioner's prognosis for improved parenting as "guarded" and opined that petitioner needed to follow up with his recommendations. On cross-examination, Dr. Baker explained that petitioner's responses on the child abuse potential inventory section of the evaluation were invalid as his score indicated that he had lied about his faults in parenting.

Z.A. and M.A.'s foster mother testified that M.A. was now five years old but acted like a three-year-old child and was not potty-trained when she was placed in the foster home. She stated that M.A. requires lights on at all times and was very afraid of the bathroom. The child indicated that the bathroom was where she would get spanked and avoided it by urinating at the bathroom's threshold. The foster mother stated that they were able to get M.A. potty-trained but that after the child went to visits with the parents, she regressed to smearing her feces and to urinating at the bathroom door. She stated that M.A. mentioned that the mother "shot her dog" and that she did not want to go to visits. On cross-examination, the foster mother stated that she had not yet been asked by the DHHR if she would adopt the children, but she wished to adopt them.

The DHHR worker testified that she had difficulty finding service providers to work with petitioner because of "his attitude towards females" and that he would not communicate with her— his assigned worker. She stated that petitioner did not speak at the MDT meeting held three weeks prior and that she had just learned today that he and the mother had divorced, and he was now in a new relationship. The DHHR worker explained that by October of 2020, petitioner had been participating in an improvement period for six months and yet his home remained in a deplorable state. So deplorable, in fact, that when the worker brought a CPS trainee to the home that month, the trainee vomited. The worker further stated that a visitation provider reported that petitioner said, "spare the rod, spoil the child," which caused concern because the children disclosed being whipped in the dark in the bathroom. The provider also reported concerns such as needing to prompt the parents to change diapers or feed the children. The worker testified that she learned that petitioner allegedly obtained an "older home that needed remodeled" but that petitioner did not tell her this information as he was "unwilling" to work with her. She stated that visits were stopped several times and were never increased due to the extremely negative impact the visits had

3

on the children. In conclusion, the DHHR worker testified that despite petitioner's overall participation in services, reunification was not in the children's best interests as they had experienced such severe trauma while in his care that they continued to have extremely negative behaviors when exposed to him.

A visitation provider testified that she observed petitioner for only six visits, but that there were no issues with those visits. However, she stated that M.A. cried "no, no, no" when she was picked up for visits and that Z.A. always cried when she left the foster home. The provider testified that she did not witness any behavioral problems from the children during the visits. She noted that she saw M.A. lean away from petitioner when he came to her car seat, but that she did not see petitioner do anything problematic.

Finally, petitioner testified that he was aware of the terms and conditions of his improvement period as were delineated at an MDT meeting held in March of 2020. He stated that he attended all supervised visits and fully participated in adult life skills sessions, parenting education classes, and individualized therapy sessions. Petitioner testified that the children never exhibited negative or avoidance behavior with him. Regarding his home, he explained that he recently obtained another trailer but that it still "needed some work done." He stated that he did not live there and that there were no working utilities, and that he abandoned his other trailer because no matter how much work he did to it, it would still be unfit for the children. Petitioner stated that since February of 2021, he was "temporarily" living with his father along with his new girlfriend of one month and that he quit his job where he had worked for four years. Petitioner stated that his interview with Dr. Baker lasted less than five minutes and that the DHHR worker failed to text him back when he attempted to contact her. The court held all rulings in abeyance and continued the hearing.

At the September of 2021 hearing, petitioner did not appear but was represented by counsel. After considering the evidence at the prior hearings, the circuit court found that petitioner had not fully participated in the psychological evaluation because he had been "defensive" in answering his questions with Dr. Baker, which invalidated the results. Further, the court found that petitioner failed to make his home suitable for the children. Petitioner was given fifteen months and a plan for obtaining suitable independent housing. Rather than make any changes to his existing home, he moved in with the paternal grandfather. Additionally, the court found that there had been a "problem with communication" between petitioner and the DHHR and noted petitioner's failure to appear at the present hearing. Regarding the children's welfare, the court found that the children's negative behaviors abated when visits with the parents ceased but reappeared when visits with the parents were reinstated. The children continued to display "significant signs of trauma," which worsened with contact with the parents. The court concluded that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future and that termination of petitioner's parental rights was necessary for the children's welfare. Petitioner now appeals the circuit court's September 20, 2021, order terminating his parental rights to the children.[2]

---

[2]The mother's parental rights were terminated below. The permanency plan for the children is adoption by their foster family.

4

The Court has previously held:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner argues that the circuit court erred in finding that he had not successfully completed the terms and conditions of his improvement period. He emphasizes that the guardian and the DHHR "admitted that he was fully compliant" with the terms and conditions of his improvement period. Petitioner further emphasizes the testimony of the visitation provider, who stated that petitioner had demonstrated the ability to safely and appropriately parent the children. Petitioner contends that the circuit court's finding that his participation in the psychological evaluation was "defensive" was in error as petitioner testified that Dr. Baker only asked him a few questions before leaving the interview for another meeting. He further contends that the circuit court's finding that petitioner failed to improve the conditions of his home was in error as the DHHR worker testified that she had not visited petitioner's new home in the eight to nine months prior to the June 23, 2021, hearing. As such, petitioner argues that there was inadequate evidence to find that his home was not suitable. Lastly, petitioner argues that the circuit court's finding that he failed to communicate with the DHHR was in error as he testified that he never changed his phone number and that the DHHR workers would not return his calls.

> At the conclusion of the improvement period, the court shall review the performance of the parents in attempting to attain the goals of the improvement period and shall, in the court's discretion, determine whether the conditions of the improvement period have been satisfied and whether sufficient improvement has been made in the context of all the circumstances of the case to justify the return of the child.

Syl. Pt. 6, *In re Carlita B.*, 185 W. Va. 613, 408 S.E.2d 365 (1991).

Here, the circuit court did not err in finding that petitioner had not made sufficient improvement to justify the return of the children to his home. "When any improvement period is granted to a [parent] . . . the [parent] shall be responsible for the initiation and completion of all terms of the improvement period." W. Va. Code § 49-4-610(4). The record establishes that petitioner failed to address the most important issue in this case—safe, clean, and suitable housing.

Petitioner's argument that there was inadequate evidence to find that his new home was inappropriate is disingenuous considering that he testified that he did not yet live there, that there were no working utilities, and that the home still needed "work" done. Further, petitioner testified that his current living arrangements with his father and new paramour were "temporary." These facts alone defeat petitioner's argument on appeal. Nonetheless, we also observe that petitioner's contentions that the DHHR workers are to blame for the lack of communication and that Dr. Baker apparently lied about his interview of petitioner concern credibility determinations that we decline to disturb on appeal. *See Michael D.C. v. Wanda L.C.*, 201 W. Va. 381, 388, 497 S.E.2d 531, 538 (1997) ("A reviewing court cannot assess witness credibility through a record. The trier of fact is uniquely situated to make such determinations and this Court is not in a position to, and will not, second guess such determinations."). Accordingly, we find no error in the circuit court's determination that petitioner failed to successfully complete the terms and conditions of his improvement period.

Next, petitioner argues that the circuit court erred in terminating his parental rights without requiring the DHHR to make reasonable efforts to reunify the family or develop a family case plan as required by West Virginia Code § 49-4-408(a). Petitioner contends that his family case plan was not filed on March 5, 2020—the date the terms and conditions of his improvement period were agreed upon by the MDT and entered by the court.

As this Court has explained,

> "[t]he purpose of the family case plan as set out in W.Va. Code [§ 49-4-408(a)] . . . is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems." Syl. Pt. 5, *State ex rel. Dep't of Human Services v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987).

Syl. Pt. 2, *In re Desarae M.*, 214 W. Va. 657, 591 S.E.2d 215 (2003). We have also stated that

> "[w]here it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children [alleged] to be abused or neglected has been substantially disregarded or frustrated, the resulting order ... will be vacated and the case remanded for compliance with that process and entry of an appropriate ... order." Syllabus point 5, in part, *In re Edward B.*, 210 W.Va. 621, 558 S.E.2d 620 (2001).

Syl. Pt. 3, *In re Emily G.*, 224 W. Va. 390, 686 S.E.2d 41 (2009).

In addressing petitioner's arguments, we note, first, that he is incorrect in stating that the DHHR failed to develop a family case plan. The record reflects that the DHHR filed case plans in March and June of 2021. Petitioner also argues, however, that because the case plans were not filed within thirty days of the inception of his improvement period, they were not compliant with West Virginia Code § 49-4-408(a) and, in the absence of a valid case plan, the court erred in terminating his rights. He cites *Desarae M.* in support, but the facts present here differ greatly from

6

those in *Desarae M.*, and the result obtained in *Desarae M.* is not appropriate here. In *Desarae M.*, the respondent parent had been complying with services during their improvement period but was actively prejudiced by the DHHR's failure to timely file a family case plan. *Desarae M.*, 214 W. Va. at 664-65, 591 S.E.2d at 222-23. Specifically, there were issues with the DHHR's personnel shortages and resultant lack of visitation and counseling providers that impacted the parent's success during their improvement period. *Id.* at 661, 591 S.E.2d at 219.

Here, by contrast, the record shows that the DHHR's failure to timely file a case plan did not prejudice petitioner. In fact, the evidence is that petitioner was provided multiple services and had several different DHHR workers and providers assigned to his case. However, he chose not to fully cooperate with these workers or stay in communication with them. Furthermore, petitioner was fully on notice of what was required of him to successfully address the conditions of abuse and neglect. Indeed, petitioner concedes on appeal that "the post-adjudicatory improvement period terms were agreed to by the MDT and entered into the court file on March 5, 2020." Nowhere does petitioner argue that he was confused or unaware of the court's expectations of him during these proceedings. In his brief, petitioner thoroughly delineates all the terms and conditions of his improvement period and goes on to claim that he participated in all of the different services provided by the DHHR. As such, there is clear evidence that there was a case plan filed, albeit untimely, and that he knew what was required of him to regain custody of his children. Accordingly, we find that the DHHR's failure to timely file a family case plan had no impact on petitioner's willful refusal to remedy the conditions of abuse and neglect in the home. Just as we found in *In re M.S.*, we find here that "[w]hile petitioner is correct that West Virginia Code § 49-4-408(a) requires that a family case plan be filed within sixty days of the child[ren] coming into foster care or thirty days of an improvement period's inception, the Court does not find reversible error on that issue under the specific limited circumstances of this case." No. 17-0222, 2017 WL 2609072, at *4 (W. Va. June 16, 2017)(memorandum decision).

Moreover, based on the evidence that petitioner had failed to stay in communication with the DHHR and, as of October of 2020, had still not obtained suitable housing, the court did not err in finding that the DHHR made reasonable efforts to reunify the family. Petitioner appears to blame the DHHR for failing to address his lack of suitable housing by arguing that it did not visit his empty, unoccupied trailer that had no working utilities—an obvious waste of time. Not only is this argument absurd but it also ignores the fact that petitioner was charged with completing the terms and conditions of his improvement period—not the DHHR. *See* W. Va. Code § 49-4-610(4)(A) ("[T]he respondent shall be responsible for the initiation and completion of all terms of the improvement period.").

Petitioner complains that the DHHR workers testified that they changed their focus away from reunification in light of his failure to obtain adequate housing. Considering that this condition was the most important condition of abuse and neglect for petitioner to correct, it logically follows that the DHHR would shift its focus away from reunification in light of this failure near the end of petitioner's improvement period. Additionally, petitioner neglects the overwhelming evidence that the children suffered from contact with him, and thus visits were never increased as would have occurred in a case on track for reunification. Here, petitioner clearly failed to follow through with the DHHR's rehabilitative services to address the conditions of abuse and neglect. Importantly, this constitutes a situation in which there is no reasonable likelihood that the conditions of abuse

7

and neglect can be substantially corrected in the near future under West Virginia Code § 49-4-604(c)(3). Finally, as previously mentioned, the children's concerning trauma-related negative behaviors increased surrounding visits with petitioner, and this evidence supported the circuit court's finding that termination was necessary for the children's welfare. According to West Virginia Code § 49-4-604(c)(6), circuit courts may terminate parental rights upon these findings.

For the foregoing reasons, we find no error in the decision of the circuit court, and its September 20, 2021, order is hereby affirmed.

Affirmed.

**ISSUED**: May 12, 2022

**CONCURRED IN BY**:

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn