STATE OF WEST VIRGINIA
SUPREME COURT OF APPEALS

**FILED**
**April 20, 2021**

EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

*In re* **L.M.**

**No. 20-0583** (Barbour County 18-JA-55)

# MEMORANDUM DECISION

Petitioner Mother S.H., by counsel Hilary M. Bright, appeals the Circuit Court of Barbour County's June 29, 2020, order denying her request for an improvement period and terminating her parental rights to L.M.[1] The West Virginia Department of Health and Human Resources ("DHHR"), by counsel Brandolyn N. Felton-Ernest, filed a response in support of the circuit court's order. The guardian ad litem, Terri L. Tichenor, filed a response on behalf of the child in support of the circuit court's order. On appeal, petitioner argues that the circuit court erred in failing to order the DHHR to develop a family case plan, denying her request for an improvement period, and terminating her parental rights without imposing a less-restrictive dispositional alternative.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

In May of 2018, the DHHR filed an abuse and neglect petition against petitioner and the child's father alleging exposure of the child to domestic violence, failure to protect the child, failure to provide the basic necessities of life, and exposure of the child to cruelty directed at

---

[1]Consistent with our long-standing practice in cases with sensitive facts, we use initials where necessary to protect the identities of those involved in this case. *See In re K.H.*, 235 W. Va. 254, 773 S.E.2d 20 (2015); *Melinda H. v. William R. II*, 230 W. Va. 731, 742 S.E.2d 419 (2013); *State v. Brandon B.*, 218 W. Va. 324, 624 S.E.2d 761 (2005); *State v. Edward Charles L.*, 183 W. Va. 641, 398 S.E.2d 123 (1990).

animals.[2] Specifically, the DHHR alleged that petitioner's home was messy and cluttered and lacked floor covering throughout the residence. According to the petition, a Child Protective Services ("CPS") worker described that the couch was covered with a hunting bow, several arrows, and other items. The worker also described L.M.—then just nine months old—as very dirty and noted an abrasion on his forehead. The DHHR also alleged there was little food in the home. According to the petition, the oldest child in the home, not at issue on appeal, participated in a Child Advocacy Center ("CAC") interview with petitioner accompanying the child. At the interview, the DHHR alleged that petitioner disclosed to CAC staff that she was a victim of domestic violence and that the child's father monitored her location via her cell phone, barred her from leaving their home without permission, and forced her to stop receiving disability assistance payments. Petitioner also disclosed that the father had killed animals in the home. The DHHR further noted that petitioner sought assistance from a domestic violence shelter. The CPS worker then decided to enact a safety plan to remove petitioner and L.M. from the home. However, the CPS worker directed petitioner to not contact the father until all of the children could be safely placed outside the home. Before those arrangements could be finalized, the father appeared at the CAC interview and began pounding on the door, demanding access to the children. Petitioner admitted that she had texted the father about the proposed safety plan. After the father was removed, the CPS worker ratified the safety plan and the child was placed with petitioner in a safe, undisclosed location. Petitioner waived her preliminary hearing and the circuit court ordered that she retain physical custody of the child.

The circuit court held an adjudicatory hearing in June of 2018 wherein petitioner stipulated to abusing and neglecting the child. Petitioner testified that the father was controlling and monitored her movement through her cell phone. However, petitioner denied that the father killed an animal in the home or in the presence of the children as alleged in the petition but admitted that she told CPS workers that he did so. Petitioner explained that she told CPS workers the father killed an animal because she misinterpreted an instance where he tossed a kitten off a bed when it was going to vomit. Petitioner testified that the kitten accidentally choked and died. Despite her prior testimony to CAC staff and the domestic violence shelter staff, petitioner testified that she was not a victim of domestic violence and specifically denied each of the allegations she made against the father at the time of the children's removal. Petitioner also recanted her testimony that the father prevented her from receiving disability payments. Instead, petitioner testified that she had been receiving disability payments due to a learning disability but that the benefit actually ended because of her age. Petitioner also testified that she did not drive and that the father would transport her wherever she needed to go. Petitioner further testified she only speaks to her mother through video chat and that the children were dirty at the time of their removal from her home because they were eating ice cream with the father's parents. Petitioner also recounted that she was asked to relocate from the domestic violence shelter she had been staying at in Morgantown because she was out repeatedly past curfew. Petitioner stated that she did not wish to live at a Fairmont shelter, so she voluntarily relinquished custody of L.M. to the DHHR and returned to live with the father. Petitioner also claimed that she returned home to the father because he told

---

[2]The proceedings in circuit court concerned additional children that are not petitioner's biological children. Petitioner raises no assignment of error regarding these children. Accordingly, these children are not the subject of this memorandum decision.

her he would lose his parental rights to the children if she did not return home. Petitioner further noted that she was going back to the shelter so that she did not lose custody of L.M. The circuit court also heard evidence at the hearing that raised concerns as to petitioner's mental health.

Next, the father testified that he had been in a relationship with petitioner for two years and admitted that their home was substandard, messy, cluttered, and had structural issues. The father also admitted that he failed to supervise the children but denied controlling petitioner. The father did acknowledge that he tracked petitioner's movements but claimed it was for her own safety. The father also denied killing animals in the home or in front of the children, despite petitioner's prior testimony and one of the children's own statements to that effect. The father acknowledged that he interrupted the CAC interview because "no one would answer him" about his children and he wanted answers. The father contended that petitioner was free to return to living at the domestic violence shelter but that her lying had to cease.

The CPS worker also testified to many of the allegations in the petition. Specifically, the worker testified that petitioner's home was in poor condition and that the children were very dirty. The worker also testified she transported petitioner, L.M., and an older child to the CAC for an interview of the older child. The worker testified that petitioner made the disclosures to her outlined in the petition, namely that she was a victim of domestic violence and that the child's father monitored her location via her cell phone, barred her from leaving their home without permission, and forced her to forgo disability assistance payments.

Finally, the child's paternal grandmother testified, seeking custody of the children. The grandmother testified that she had no relationship with petitioner because she refused to come into the grandmother's home, or, when petitioner did enter the home, she immediately went to the back living room, pulled up her hood over her head, and refused to speak to anyone. The grandmother testified that petitioner could not parent L.M. and believed she left the child in the crib for long periods of time, resulting in a flat spot on the child's head. The grandmother also testified that she filed an emergency petition for custody when L.M. was just three weeks old because she was concerned for the child's safety. The grandmother testified that the family court granted her custody of the infant, but that petitioner hid the child from her between the day she filed the petition and the date of the hearing.

After hearing the evidence, the circuit court found that the "testimony presented . . . raises concerns regarding the mental health history of [petitioner]." The circuit court granted the DHHR's request to continue the adjudicatory hearing to allow it to gather and present additional evidence concerning the child's parents. The circuit court also ordered the child's parents to participate in psychological evaluations. Finally, the circuit court scheduled the continued adjudicatory hearing for October of 2018.

In October of 2018, the circuit court granted a motion by the guardian to continue the adjudicatory hearing because service providers were unable to set psychological evaluation appointments for either parent in time for the reports from the evaluations to be available before the scheduled hearing. In December of 2018, the circuit court held a permanency and status review conference where it continued the child's placement.

In January of 2019, the circuit court held the continued adjudicatory hearing where it took judicial notice of the testimony and evidence introduced at the prior hearing. The circuit court also admitted the parents' psychological evaluations. At the hearing, the guardian acknowledged that while "testimony . . . has been somewhat conflicting," the psychological evaluations and evidence made clear that both parents minimized the amount of domestic violence in their home, to which the children were exposed and subjected. The circuit court found that each parent "gave cause for tremendous concern regarding abuse of the children" and abuse of animals in front of the children. The circuit court further found the home was still in poor condition and that neither parent provided credible testimony. The circuit court also found that L.M. was subjected to "much more severe and pervasive abuse" than either parent admitted. The child's parents filed motions for post-adjudicatory improvement periods, which the circuit court deferred ruling upon. Following the hearing, the circuit court held permanency and status review conferences in March and June of 2019 wherein it continued the child's placement.

In August of 2019, the DHHR filed a family case plan which noted that the child had been in the DHHR's custody for fifteen of the last twenty-two months and that there was no reasonable likelihood that the conditions of abuse or neglect could be substantially corrected in the near future. The DHHR explained that despite the provision of numerous services, such as parenting classes, assistance in obtaining housing, and counseling, petitioner failed to protect L.M. from domestic violence and continued to minimize her role in the abuse and neglect of the child. According to the case plan, since L.M.'s removal from petitioner in April of 2018, she did not have more than two hours of supervised visitation with the child per week. Finally, petitioner failed to be "open and honest" with the DHHR when she denied being pregnant on multiple occasions yet delivered a new baby in April of 2019.

The circuit court received a letter from petitioner expressing her dissatisfaction with her counsel and requesting new counsel in August of 2019. Later that month, petitioner's counsel filed a motion to withdraw from the proceedings. The circuit court held a hearing on the motion wherein petitioner's counsel explained that she was withdrawing upon petitioner's request and cited petitioner's refusal to speak with her. The circuit court explained to petitioner that should she receive new counsel, the proceedings would be further delayed, which petitioner acknowledged. The circuit court granted petitioner's counsel's motion to withdraw because of petitioner's refusal to cooperate with her and ordered that the child remain in the custody of the DHHR.

The DHHR filed a revised family case plan in October of 2019 recommending termination of petitioner's parental rights. The DHHR stated that petitioner had been adjudicated as an abusing parent, failed to receive an improvement period as a result of dishonesty with the circuit court about the father's domestic violence, her new pregnancy resulting in the birth of a second child, and returning physical custody of L.M. in order to live with the child's father. The DHHR also identified various treatment goals in the case plan that petitioner failed to meet, including faithful attendance at multidisciplinary team ("MDT") meetings and counseling, obtaining housing, and gaining employment. The DHHR noted that petitioner failed to continue therapy and, during visitation with the child, interacted with the supervisor instead of with the child. Finally, the DHHR explained that (1) it did not timely file a case plan because petitioner did not receive an improvement period, and (2) it had orally communicated expectations and goals with petitioner at every MDT meeting.

The guardian also filed a report recommending termination of petitioner's parental rights. According to the guardian, petitioner made no real progress despite the DHHR and two domestic violence shelters providing her services. The guardian noted that petitioner made detailed disclosures of domestic violence in the father's home, yet she recanted that testimony at the adjudicatory hearing and surrendered the child to return to live with him. The guardian explained that petitioner attended several MDT meetings but was unable to make progress toward independence, as she lacked insight into what constituted appropriate housing and had difficulty maintaining employment. The guardian was also concerned that petitioner was dishonest about her pregnancy with a second child and could not care for two children under the age of three. Finally, the report noted that petitioner never acknowledged the abuse and neglect in the father's home and continued to deny her own abusive and neglectful conduct that formed the basis of her adjudication.

The next month, the circuit court held a final dispositional hearing where it heard evidence consistent with the DHHR's case plan recommending termination of petitioner's parental rights. First, an employee from the domestic violence shelter testified that she had concerns with petitioner's parenting of L.M. at the shelter. Specifically, the worker testified that petitioner allowed L.M. to soak through his clothes with a wet diaper on at least two to three separate occasions. The worker also testified that petitioner seemed depressed and uninterested when the child would cry out for her. The worker stated that she recommended counseling to petitioner as well. Finally, the worker testified that petitioner stayed at the shelter for two or three weeks before she voluntarily left and relinquished custody of L.M. Next, a CAC employee testified as to petitioner's disclosures of domestic violence and the father's treatment of animals in front of her and the children, among other claims. The CAC worker also recalled specific incidents of domestic violence that the father committed against petitioner, including barring her from leaving the home with the child after he was born and destroying cell phones she hid around the home. The CAC worker indicated that petitioner also disclosed multiple attempts she made to leave the father, which he prevented. The CAC worker also indicated that during petitioner's time making these disclosures, the staff had to prompt petitioner to change the child's diaper. The CAC worker indicated that petitioner did not have diapers or wipes with her but that the staff provided the items to her.

Next, a service provider testified that she worked with petitioner from August of 2018 through April of 2019. The service provider testified that petitioner successfully completed adult life skills and parenting classes and had positive visits with L.M. However, the service provider also testified that petitioner failed to gain housing, employment, or a driver's license, despite receiving assistance in all three areas. The service provider also testified that although petitioner was successful in supervised visits with the child, it would have been "hard to say" whether she could care for L.M. fulltime thereafter. The service provider further testified that petitioner repeatedly told her and others at MDT meetings that she was not pregnant, despite later giving birth to a second child. Finally, the service provider testified that petitioner moved into her mother's house near the end of services, despite the DHHR deeming the home an unsuitable placement for L.M. because of the grandmother's past abuse of petitioner and criminal history. The DHHR also presented another service provider who testified that she witnessed petitioner's visits with L.M. and had concerns that she mostly sat and had little interaction with L.M. This

service provider also testified that she did not think L.M.—who was two years old at the time—would be safe in petitioner's care.

Next, the CPS caseworker testified that petitioner left a domestic violence shelter and voluntarily relinquished custody of L.M. to return to live with the father, despite efforts to persuade her to stay at a shelter with twenty-four-hour staffing. The caseworker also testified that petitioner lied about being pregnant with a second child on several occasions, including under oath to the circuit court. The caseworker further testified that after leaving the shelter and returning to the father's residence, petitioner then moved into her grandparents' home. According to the caseworker, petitioner moved in with her grandparents despite their prior criminal history, which they disclosed when they were denied a home study for placement of the child. The caseworker indicated that expectations and services were provided to petitioner at every MDT meeting and that petitioner understood the requirements. Despite this, the caseworker testified that petitioner still struggled to parent L.M. and was failing to change his diaper without being prompted and failing to sustain attention on the child during their one hour supervised visits.

Finally, petitioner testified that the father was controlling and admitted she fabricated her testimony about him at the adjudicatory hearing because she was trying to protect him from losing his parental rights. Petitioner also explained that she was worried about the welfare of the child when she chose to voluntarily relinquish custody of the child to the DHHR while she went to live with the father. Petitioner said she had heard horror stories about life in the shelter. Petitioner further explained that she was now employed at a fast-food restaurant and was participating in visits with L.M. Petitioner also acknowledged that she was dishonest about her pregnancy with her attorney but denied misleading the circuit court.

In light of the evidence, the circuit court found that petitioner was provided the opportunity to separate from the child's father but instead chose to separate from the child. The circuit court also found that petitioner provided false testimony at the adjudicatory hearing and only at the dispositional hearing did she acknowledge domestic violence in the father's home for the first time. The circuit court found that petitioner had not made significant progress in the last eighteen months of the proceedings and additional time would not improve the situation. Ultimately, the circuit court concluded that there was no reasonable likelihood that the conditions of abuse and neglect could be substantially corrected in the near future and that it was in the best interest of the child to terminate petitioner's parental rights. The circuit court's June 29, 2020, dispositional order reflected this termination.[3] It is from this dispositional order that petitioner appeals.

The Court has previously established the following standard of review:

> "Although conclusions of law reached by a circuit court are subject to *de novo* review, when an action, such as an abuse and neglect case, is tried upon the facts without a jury, the circuit court shall make a determination based upon the evidence and shall make findings of fact and conclusions of law as to whether such child is abused or neglected. These findings shall not be set aside by a reviewing

---

[3]The father voluntarily relinquished his parental rights. The permanency plan for the child is adoption in his current placement.

court unless clearly erroneous. A finding is clearly erroneous when, although there is evidence to support the finding, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. However, a reviewing court may not overturn a finding simply because it would have decided the case differently, and it must affirm a finding if the circuit court's account of the evidence is plausible in light of the record viewed in its entirety." Syl. Pt. 1, *In Interest of Tiffany Marie S.*, 196 W.Va. 223, 470 S.E.2d 177 (1996).

Syl. Pt. 1, *In re Cecil T.*, 228 W. Va. 89, 717 S.E.2d 873 (2011).

On appeal, petitioner alleges that the circuit court erred in denying her motion for a post-adjudicatory improvement period because she had established by clear and convincing evidence that she was likely to fully participate in an improvement period and acknowledged the abuse and neglect in her home. Petitioner argues that she completed parent education classes, participated in supervised visits with the child, obtained employment, ceased contact with the child's father, attended scheduled court hearings, and sought housing. Petitioner also contends that although she made false statements at various points in the proceedings, she recanted and was truthful at the dispositional hearing and noted that she lived in fear of the child's father and domestic violence. Further, petitioner avers that multiple witnesses testified to her compliance during the proceedings demonstrating that she could have completed an improvement period. In light of these claims, she argues that the circuit court erred in failing to grant her a post-adjudicatory improvement period. We disagree.

This Court has held that "a parent charged with abuse and/or neglect is not unconditionally entitled to an improvement period." *In re Emily*, 208 W. Va. 325, 336, 540 S.E.2d 542, 553 (2000). West Virginia Code § 49-4-610(2)(B) provides that the circuit court may grant a parent a post-adjudicatory improvement period when the parent "demonstrates, by clear and convincing evidence, that the [parent] is likely to fully participate in the improvement period." "This Court has explained that 'an improvement period in the context of abuse and neglect proceedings is viewed as an opportunity for the . . . parent to modify his/her behavior so as to correct the conditions of abuse and/or neglect with which he/she has been charged.'" *In re Kaitlyn P.*, 225 W. Va. 123, 126, 690 S.E.2d 131, 134 (2010) (citation omitted). However, the circuit court has discretion to deny an improvement period when no improvement is likely. *See In re Tonjia M.*, 212 W. Va. 443, 448, 573 S.E.2d 354, 359 (2002). Further, we have previously held that

> [i]n order to remedy the abuse and/or neglect problem, the problem must first be acknowledged. Failure to acknowledge the existence of the problem, i.e., the truth of the basic allegation pertaining to the alleged abuse and neglect or the perpetrator of said abuse and neglect, results in making the problem untreatable and in making an improvement period an exercise in futility at the child's expense.

*In re Timber M.*, 231 W. Va. 44, 55, 743 S.E.2d 352, 363 (2013) (citation omitted).

Contrary to petitioner's argument, we see no error in the circuit court's determination that petitioner was not likely to fully participate in an improvement period. The circuit court found that petitioner failed to make significant progress during the eighteen-month course of the proceedings,

including the fact that she minimized responsibility for abusing and neglecting the child. Additionally, at one point during the proceedings, petitioner voluntarily relinquished custody of the child to live with the child's abusive father. While petitioner argues that she eventually separated herself from him, she recanted all of her allegations of domestic violence in the home and misled the circuit court at the adjudicatory hearing. The guardian and service providers testified that petitioner continued to deny that the father committed domestic violence during MDT meetings as well, despite her prior disclosures of abuse to CAC and domestic violence shelter staff. As such, petitioner did not acknowledge any domestic violence until the dispositional hearing, when the DHHR and guardian were seeking termination of her parental rights. Further, the circuit court found that although the DHHR offered petitioner many services throughout the proceedings, it was difficult for the DHHR to continue offering services or the court to grant her an improvement period because of petitioner's dishonesty with the MDT about her pregnancy with a second child, and failure to acknowledge domestic violence in the home. Petitioner also failed to continue therapy and interacted with the supervisor during her visitation time with the child instead of interacting with the child. Indeed, several service providers testified that petitioner was disinterested during her visits with the child and often needed prompting to change L.M.'s diaper or otherwise care for the child. The CPS caseworker also testified that petitioner failed to complete many services meant to help her gain independence and parent the child, such as obtaining housing or a driver's license, gaining employment, and participating in counseling. Although petitioner now contends that she is working and has sought housing, she only recently obtained employment and was still seeking suitable housing eighteen months after the proceedings began. As such, there is ample evidence that petitioner failed to make any substantial changes in her behavior despite the provision of numerous services to her throughout the proceedings. Indeed, by petitioner's own admission, she was dishonest with the court and service providers throughout the proceedings. Given this evidence, we find no error in the circuit court's decision to deny petitioner a post-adjudicatory improvement period.

Next, petitioner argues that the circuit court erred in failing to order the DHHR to develop a family case plan and that the DHHR did not file the case plan within sixty days of the child going into foster care as required by law. Further, petitioner argues that the circuit court violated her due process rights by not addressing her objections to the case plan. We find petitioner's arguments unavailing.

We begin by finding that the DHHR's failure to file its case plan in a timely manner does not, under the limited facts of this case, constitute reversible error. As this Court has explained,

> "[t]he purpose of the family case plan as set out in W.Va. Code [§ 49-4-408(a)] . . . is to clearly set forth an organized, realistic method of identifying family problems and the logical steps to be used in resolving or lessening these problems." Syl. Pt. 5, *State ex rel. Dep't of Human Services v. Cheryl M.*, 177 W.Va. 688, 356 S.E.2d 181 (1987).

Syl. Pt. 2, *In re Desarae M.*, 214 W. Va. 657, 591 S.E.2d 215 (2003). Here, petitioner does not dispute that the DHHR filed a case plan at least five days prior to the dispositional hearing in accordance with West Virginia Code § 49-4-604(a), nor does she allege that the case plan the DHHR filed was deficient in setting forth the manner in which she could correct the conditions of

abuse and neglect at issue. Instead, she alleges that the goals and expectations changed between the filing of the case plan in August of 2019 and the filing of the revised case plan in October of 2019.

However, we find that petitioner was in no way prejudiced by any issue surrounding the case plan's creation. Petitioner testified at the dispositional hearing that she was aware of the expectations in complying with services throughout the proceedings. In her testimony, petitioner acknowledged that she needed to maintain housing, gain employment, and separate from the father. Additionally, the CPS caseworker and service providers testified that progress on each of these conditions was discussed with petitioner at each MDT meeting she attended. Further, petitioner does not dispute that these expectations were orally communicated to her at every meeting. Based on the record, it is clear that the purpose of the family case plan was achieved, as petitioner was aware of the problems that needed to be addressed and the steps to resolve them. Indeed, the circuit court found that "despite no [initial] case plan being filed, the goals for [petitioner] were made clear at all times." Further, petitioner was not prejudiced by the DHHR seeking termination of her parental rights at the dispositional hearing because she had notice that this would happen. Specifically, both the DHHR and the guardian filed documents with regard to the child prior to the dispositional hearing expressing an intention to seek the termination of petitioner's parental rights. Essentially, the facts of this case show that petitioner was well aware what conditions she needed to correct in order to regain custody of the child and that her parental rights would be terminated if she did not correct these conditions.

As this Court has held, vacation of dispositional orders is warranted "[w]here it appears from the record that the process established by the Rules of Procedure for Child Abuse and Neglect Proceedings and related statutes for the disposition of cases involving children [alleged] to be abused or neglected has been substantially disregarded or frustrated." Syl. Pt. 3, in part, *In re Emily G.*, 224 W. Va. 390, 686 S.E.2d 41 (2009). Because we find, under the limited circumstance of this case, that petitioner was not prejudiced by the DHHR's failure to file the case plan within sixty days of the child's placement in foster care, we find that vacation of the dispositional order is not warranted.

Additionally, petitioner alleges that the circuit court should have imposed a less-restrictive dispositional alternative pursuant to West Virginia Code § 49-4-604(c)(5). However, the evidence introduced during the proceedings below supports the circuit court's termination of petitioner's parental rights. West Virginia Code § 49-4-604(c)(6) permits a circuit court to terminate parental rights upon finding that "there is no reasonable likelihood that the conditions of neglect or abuse can be substantially corrected in the near future" and that termination is necessary for the welfare of the child. With these parameters in mind, it is clear that the record supports the circuit court's finding that there was no reasonable likelihood that petitioner could substantially correct the conditions of abuse and neglect, given her lack of candor with the court and service providers about domestic violence within the home, her pregnancy with a second child, and her minimization of the abuse and neglect subjected upon L.M. While it is true that petitioner may eventually gain independence by obtaining housing, maintaining fulltime employment, and resuming counseling, any such possible improvement is based on pure speculation. Indeed, petitioner denied any issues with domestic violence at the hands of the child's father or failing to provide for the child throughout the proceedings. Further, petitioner often failed to avail herself of the DHHR's

services, even at times when she was separated from the child's father. The record shows that the child would have been at risk if returned to petitioner's care, given her poor decision-making throughout the proceedings. As such, it is clear that the child's welfare required termination of petitioner's parental rights.

Finally, petitioner takes issue with the timeframe from adjudication to termination, arguing that she should have been given additional time and an opportunity to demonstrate that she could correct the conditions of abuse and neglect. However, petitioner was provided nearly eighteen months of services, including supervised visits with the child, assistance in obtaining housing, and counseling. Over the course of these eighteen months, petitioner failed to obtain housing, was disinterested during her visits with the child, and discontinued counseling. As such, petitioner was provided ample time and she failed to demonstrate that she could correct these conditions. Additionally, we have previously held that "[c]ourts are not required to exhaust every speculative possibility of parental improvement . . . where it appears that the welfare of the child will be seriously threatened." *Cecil T.*, 228 W. Va. at 91, 717 S.E.2d at 875, syl. pt. 4, in part (citation omitted). Further, we have held that

> "[t]ermination of parental rights, the most drastic remedy under the statutory provision covering the disposition of neglected children, [West Virginia Code § 49-4-604] may be employed without the use of intervening less restrictive alternatives when it is found that there is no reasonable likelihood under [West Virginia Code § 49-4-604(d)] that conditions of neglect or abuse can be substantially corrected." Syllabus point 2, *In re R.J.M.*, 164 W.Va. 496, 266 S.E.2d 114 (1980).

Syl. Pt. 5, *In re Kristin Y.*, 227 W. Va. 558, 712 S.E.2d 55 (2011). Accordingly, we find no error in the termination of petitioner's parental rights.

For the foregoing reasons, we find no error in the decision of the circuit court, and its June 29, 2020, order is hereby affirmed.

Affirmed.

**ISSUED**: April 20, 2021

**CONCURRED IN BY**:

Chief Justice Evan H. Jenkins
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice John A. Hutchison
Justice William R. Wooton